883 S.W.2d 711 (1994)
R____ S____ and J____ S____, Appellants,
v.
B____ J____ J____ and B____ C____ J____, Appellees.
No. 05-93-00848-CV.
Court of Appeals of Texas, Dallas.
August 17, 1994.
*713 Richard D. William, Greenville, for appellants.
Russell P. Brooks, H. Craig Black, Atty. ad litem, Greenville, for appellees.
Before LAGARDE, BARBER and WHITTINGTON, JJ.

OPINION
LAGARDE, Justice.
R__ and J__ S__ ("Mr. S__" and "Mrs. S__" or collectively "the parents") appeal an order naming appellees B__ and C__ J__ ("Mr. J__" and "Mrs. J__" or collectively "the nonparents") managing conservators of two of the parents' three children.[1] In two points of error, the parents (i) challenge the sufficiency of the evidence and (ii) argue that separating their children is against public policy. We affirm.
The parents have three children: R__ R__ S__ ("B__"), L__ M__ S__ ("L__"), and J__ D__ S__ ("P__").[2] L__ and P__ (collectively *714 "the children") are the subject of this litigation. The testimony at trial was confusing and, at times, hotly disputed. Briefly, however, the basic undisputed facts are as follows.
In 1987, Mrs. J__ was a good friend of the parents.[3] In August 1987, Mrs. S__ voluntarily relinquished P__, then only fifteen and one-half months old, into the care of Mrs. J__. This arrangement was originally intended to be temporary. Except for a couple of overnight outings with the parents before 1989, however, P__ lived continuously with Mrs. J__ until September 1990. In January 1989, Mrs. S__ voluntarily placed L__, then six years old, into the care of Mrs. J__. From this date until September 1990, the parents had no contact whatsoever with either child. The parents never provided Mrs. J__ with any child support for the costs incurred in raising their children.
In September 1990, the nonparents filed this action seeking managing conservatorship of the children. Following a hearing, the nonparents were named temporary managing conservators and the parents were named temporary possessory conservators with standard visitation rights. Despite living more than one hundred miles away, the parents frequently exercised their visitation rights after September 1990.
The parents counterclaimed, seeking managing conservatorship and alleging intentional and negligent infliction of emotional distress through the nonparents' acts of "secluding" and "abducting" the children. The nonparents amended their pleadings to request termination of parental rights and adoption or, in the alternative, managing conservatorship. Following a trial to the court, the judge declined to terminate the parents' parental rights; however, the court's judgment named the nonparents as managing conservators and the parents as possessory conservators. The court also denied recovery on the parents' counterclaims.

SUFFICIENCY OF THE EVIDENCE
In their first point of error, the parents assert that the trial court erred in awarding custody of the children to the nonparents "because the evidence was not sufficient for this ruling." This point of error is ambiguous because it can be interpreted as challenging either the legal or factual insufficiency of the evidence. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.1965). The general rule is that unless the context shows that the words were used in a different sense, references to the insufficiency of the evidence are usually construed to mean factual insufficiency. Id.
The parents' own statement best summarizes their argument on appeal: "Appellees have not met their burden of proof and [sic] introducing into evidence specific acts of the natural parents which would disqualify them as being managing conservators over the children." The thrust of the parents' argument is that no evidence was presented to overcome the legislative presumption that children belong in the custody of their natural parents. See Tex.Fam.Code Ann. § 14.01(b) (Vernon Supp.1994). Further, the parents' brief did not suggest a standard of review to be applied.[4] The parents conclude their brief by "pray[ing] that this Court reverse the decision of the [t]rial [c]ourt and render a judgment in favor of [a]ppellants." Legal insufficiency points call for the reversal and rendering of a judgment in favor of appellant, while factual insufficiency points call for the reversal and remanding for a new trial. Alstan Corp. v. Board of Admin., 713 S.W.2d 130, 132 (Tex.App.-Austin 1986, writ ref'd n.r.e.) (citing Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 361, 362 & 365 (1960)).
We conclude from the parents' arguments and prayer that this point of error challenges *715 only the legal sufficiency of the evidence. See Alstan Corp., 713 S.W.2d at 132 (prayer for rendition of judgment a factor in determining point of error was "no evidence" point). Assuming, arguendo, that our construction of the parents' point of error is incorrect, the parents' point of error is a factual insufficiency point. See Garza, 395 S.W.2d at 823 (general rule). In the interest of judicial economy and with the welfare of the real parties-in-interest in this case, the children, in mind, we will also consider the factual sufficiency of the evidence.

Standards of Review
A. Legal Sufficiency
Legal insufficiency or no-evidence points are questions of law. Tomlinson v. Jones, 677 S.W.2d 490, 492 (Tex.1984). In reviewing a no-evidence point, we consider only the evidence and reasonable inferences drawn therefrom which, when viewed in their most favorable light, support the trial court's findings. Lewelling v. Lewelling, 796 S.W.2d 164, 166 (Tex.1990). We disregard all evidence and inferences to the contrary. Id. The findings must be upheld if there is more than a scintilla of evidence to support them. Stedman v. Georgetown Sav. & Loan Ass'n, 595 S.W.2d 486, 488 (Tex.1979). Evidence is no more than a scintilla when it is "so weak as to do no more than create a mere surmise or suspicion of [the fact's] existence." Seideneck v. Cal Bayreuther Assocs., 451 S.W.2d 752, 755 (Tex.1970) (quoting Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. at 363). If the evidence supplies some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact, however, then there is some evidence, or, in other words, more than a scintilla of evidence. Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex.1983).
B. Factual Sufficiency
In reviewing a factual sufficiency point, we consider all the evidence, including any evidence contrary to the judgment. PlasTex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex.1989). This Court must consider, weigh, and compare all the evidence in the record pertinent to the issue under consideration. Sosa v. City of Balch Springs, 772 S.W.2d 71, 72 (Tex.1989) (per curiam); Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex.1986). We set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex.1986) (per curiam).
In reviewing factual insufficiency points, we note that this Court is not a fact finder, and we cannot substitute our judgment for that of the trial court, as fact finder, even if a different finding could be reached on the evidence. Brigham v. Brigham, 863 S.W.2d 761, 763 (Tex.App.-Dallas 1993, writ denied); Clancy v. Zale Corp., 705 S.W.2d 820, 826 (Tex.App.-Dallas 1986, writ ref'd n.r.e.). It is within the province of the trier-of-fact to weigh the credibility of the witnesses. The trial court, as fact finder, was the judge of the facts proved and of the reasonable inferences to be drawn therefrom. Brigham, 863 S.W.2d at 763; see Lockley v. Page, 142 Tex. 594, 598, 180 S.W.2d 616, 618 (1944).

Applicable Law
A. Presumed Findings
In reviewing a judgment from a bench trial, we ordinarily look to the formal findings of fact and conclusions of law. Although the parents requested formal findings and conclusions, none appear in the record.[5] The record does not reflect that appellant filed a "Notice of Past Due Findings of Fact or Conclusions of Law" in accordance with our rules of procedure. See Tex.R.Civ.P. 297. Where findings of facts and conclusions of law are not properly requested and none are filed, the judgment of the trial court must be affirmed if it can be upheld on any legal theory that finds support in the evidence. *716 In the Interest of W.E.R., 669 S.W.2d 716, 717 (Tex.1984) (per curiam) (citing Lassiter v. Bliss, 559 S.W.2d 353, 356 (Tex. 1977)). This is so regardless of whether the trial court articulates the correct legal reason for the judgment. J.M.R. v. A.M., 683 S.W.2d 552, 555 (Tex.App.-Fort Worth 1985, writ ref'd n.r.e.) (citing Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W.2d 73, 84 (1939)).
B. Family Code
The appointment of managing conservators is governed by section 14.01 of the family code, which states, in part, as follows:
(b) A parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child unless:

(1) the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development; or

(2) a person who is not a parent seeks appointment as managing conservator of the child by intervening in or commencing a suit affecting the parent-child relationship... and the court finds that:
(A) the child's ... parents have voluntarily relinquished possession and control of the child to the person ... for a period of one year or more a portion of which was within 90 days preceding the date of intervention or commencement of the suit or proceeding; and

(B) the appointment of the person as managing conservator of the child is in the best interest of the child.
TEX.FAM.CODE ANN. § 14.01(b) (Vernon Supp. 1994) (emphasis added). The nonparents' second-amended petition, their live pleading at trial, alleged sufficient facts to give the parents notice that the nonparents were seeking relief under sections 14.01(b)(1) and 14.01(b)(2). Therefore, the trial court's judgment will be upheld if the record supports the naming of managing conservators under either theory. See In the Interest of W.E.R., 669 S.W.2d at 717.
In order to prevail under section 14.01(b)(2), the nonparents had to prove that (i) they sought appointment as managing conservators; (ii) the parents voluntarily relinquished possession and control of each child to them for at least one year, a portion of which was within the ninety-day period preceding the suit; and (iii) appointment of the nonparents as managing conservators is in the best interest of the children.[6] Tex.Fam.Code Ann. § 14.01(b)(2) (Vernon Supp.1994). Although there are numerous cases[7] interpreting section 14.01(b)(1), neither party has cited a case construing section 14.01(b)(2). Because we, too, have been unable to find such a case, this appears to be a case of first impression.
Although only recently codified, for one hundred years Texas has used the "best interest of the child" test in determining whether a parent may reacquire custody of a child after voluntarily relinquishing that child into the custody of another for a substantial period of time. See Legate v. Legate, 87 Tex. 248, 252, 28 S.W. 281, 282 (1894); see also Herrera v. Herrera, 409 S.W.2d 395, 396 (Tex.1966); Mumma v. Aguirre, 364 S.W.2d 220, 221 (Tex.1963). Because there is a presumption that a minor child's interests are best served by custody with the natural parents, the burden of proof on the issue of the *717 best interest of the child is on the one seeking to deprive the natural parents of custody. See TEX.FAM.CODE ANN. § 14.01(b) (Vernon Supp.1994); Herrera, 409 S.W.2d at 396. However, the trial court's determination of the child's best interest should only be reversed when it appears from the record as a whole that the court abused its discretion. Herrera, 409 S.W.2d at 363.

Facts
A. Voluntary Relinquishment
At trial, the testimony was undisputed that Mrs. S__ voluntarily gave custody of P__ to Mrs. J__ around the first of August 1987. It was also undisputed that until at least November 1988, both parents knew where P__ was, yet neither parent asked for his return.
On at least two occasions during 1987, Mr. S__ visited P__. One visit occurred at Mrs. J__'s house and another at Mr. S__'s brother's house. At the conclusion of each visit, Mr. S__ left P__ in Mrs. J__'s custody. During 1988, Mrs. S__ had some contact with P__, but always returned him to Mrs. J__. The frequency of contact was disputed. Mr. S__ testified initially that he did not see P__ from December 1987 until this suit was filed in September 1990. He later admitted, however, seeing P__ probably twice after December 1987.
In October 1988, Mr. S__ moved temporarily to Las Vegas, Nevada for business. In November, Mrs. J__ and P__ moved to Oklahoma. Mrs. J__ testified that she informed Mrs. S__ of her new address. After arriving in Oklahoma, Mrs. J__ telephoned Mrs. S__ and they discussed L__ and B__ coming to live with Mrs. J__ because the parents did not have any utilities. Mrs. J__ told Mrs. S__ that she did not think she could handle any more children because, at the time, she was unemployed. Mrs. S__ did not dispute this testimony.
In December 1988, Mrs. J__ wrote Mrs. S__ a letter telling her that she would try to care for one more child. While in Texas for the holidays, Mrs. J__ made several attempts to contact Mrs. S__ by telephone, but was unable to do so until the morning of January 3, 1989, the day Mrs. J__ was to return to Oklahoma. She and P__ went over to the parents' house and from there accompanied Mrs. S__ to check out L__ from school. Mrs. S__ packed up all L__'s belongings and L__ returned to Oklahoma with Mrs. J__ and P__. L__ was six years old.
Mrs. J__ testified that there was no discussion of when the children would be returned, except that Mrs. S__ agreed not to move them back and forth during the school year. It is undisputed that Mrs. S__ knew Mrs. J__'s address in Oklahoma. Mrs. J__, in fact, testified that she sent Mrs. S__ several letters and that they called each other on the telephone during this time period.[8]
Mr. S__ returned from Las Vegas a few days after Mrs. S__ gave custody of L__ to Mrs. J__. Mr. S__ was upset by the arrangement. Mr. S__ testified that he never knew the whereabouts of his children after Mrs. J__ moved from Fort Worth in 1988. He stated that his wife told him that she did not know where the children were living. He attempted to locate them by asking relatives and acquaintances that might know Mrs. J__'s whereabouts, but no one would tell him. He admitted, however, that he never called the police, any welfare agencies, or any other authorities to assist in returning his children to him. He did admit that he trusted Mrs. J__ to take good care of his children.
Mr. S__ could not provide an explanation for why his wife refused to tell him the location of his children. The court-appointed psychiatrist who examined the parties, however, pointed out that because of Mrs. S__'s dependence on her husband, Mr. S__ probably would have been able to obtain Mrs. J__'s address from Mrs. S__, if he had really tried, unless she was refusing to disclose it for some reason.
In June 1989, Mrs. J__ moved from Oklahoma back to Texas. In August 1989, she married Mr. J__. Mrs. J__ testified that she wrote and talked to Mrs. S__ after moving *718 back to Texas. She stated that she told Mrs. S__ of her new address and also informed the parents' telephone intermediary neighbors, people and officials in Oklahoma, and various people in Texas of her new Texas address. Mrs. J__ testified that she was not attempting to hide from the parents.
Mrs. S__, however, adamantly disagreed. She testified that the last address she had for Mrs. J__ and her children was in Oklahoma. In fact, in July 1990, she mailed a letter to Mrs. J__ at the Oklahoma address, but it was returned "forwarding address expired." Mrs. J__, however, introduced into evidence a picture of B__, undisputedly taken in the fall of 1989, that she had received from Mrs. S__ in Texas. Mrs. J__ also testified that the letter accompanying the picture was addressed to her in Texas.
B. Best Interest of the Children
The court appointed Dr. Steven Edward Ball to prepare psychological reports on the parties in this case. Ball interviewed and tested the parents, the nonparents, P__ and L__. All reports were admitted into evidence. In addition, Ball testified in person.
The doctor's report on Mr. S__ indicated that his I.Q. is in the low-normal to borderline range. He is a man of action rather than talk. The evaluation revealed a "possibility of significant alcohol or drug abuse." The report stated that
[Mr. S__] is also apt to be somewhat gregarious and outgoing, capable of making a good first impression. He may prove, however to be manipulative and deceptive. Under the outward show, [Mr. S__] may be very dissatisfied and can experience episodic depression.
Nevertheless, Ball concluded that, in many respects, Mr. S__ would not present any difficulties if appointed managing conservator. His major concern was the propensity of an addictive personality.
Both of the parents admitted that Mr. S__ had an alcohol problem in the past, but both adamantly testified that he had quit drinking "cold turkey." They were unable, however, to enunciate a clear date of his quitting, giving sometime in 1989, 1990, and 1991 as the date of his last drink.
Ball's evaluation of Mrs. S__ revealed an I.Q. in the mildly retarded range. Although one test suggested intense feelings of insecurity and possible strong self-destructive thoughts, other tests qualified this "bleak picture," describing her as having good esteem, not depressed, and quite capable of bonding with others. The report concluded that Mrs. S__ "seems to offer little problem should she be named managing conservator," although she could benefit from a parenting skills class.
Ball's report of Mrs. J__ indicated an I.Q. in the normal to low-normal range, socially introverted, shy, lacking confidence, easily having difficulty making decisions. Moderate depression, attributable to the current legal battle, was evident; she did not appear to be carrying much hostility or the likelihood of aggressive behavior; and was "apt to be fairly self-reliant." The report concluded that although she could benefit from parenting skills training, Ball could see little reason why she should not be able to function effectively in a parenting role.
Finally, the evaluation of Mr. J__ revealed a normal to low-normal I.Q. range. In the past, Mr. J__ had suffered a severe trauma in an automobile-train collision. He is, however, surprisingly free from neuropsychological fall-out from it. Mr. J__ may be suspicious of others and their motives. Relationships are important to him and he maintains them appropriately. He is an emotional man and has good coping skills. He gets along well with others. The report concluded that a parenting skills course could prove helpful, but there is no significant barrier to his serving as managing conservator.
Ball testified that neither the parents nor the nonparents would pose a threat to the physical or emotional well-being of the children. In fact, both of the parents stated that they had no complaints about how their children were being raised by the nonparents. They knew they were being treated well.
Mrs. J__, however, testified that the best interest of the children would not be served by naming the parents as managing conservators. *719 In her estimation, the parents had ignored their children by not visiting with, speaking to, or writing to them for about eighteen months. During the entire period that she cared for them before the filing of the lawsuit, they never once sent a birthday or Christmas present or even a card. Neither did she receive any support to raise them, except for a few diapers and about $60 soon after she was given P__. None of the relatives of the parents sent birthday or Christmas cards either; however, Mrs. J__'s relatives didtreating the children like a member of their own family.
There was testimony that both the parents and the nonparents live below the poverty line. The parents had not given any thought to counseling for the children or themselves. The nonparents, however, were trying to get the children back into counseling.
Ball also evaluated the children. His 1992 report reveals that L__ is educationally impaired and severely disturbed. She has improved, however, since 1990 based on comparative tests performed soon after she enrolled in a Texas school. L__ has reactive attachment disorder, a rare disorder in which she does not "bond well to others, to the significant people in [her] life." The cause occurred well before the custody fight began.
Ball's report on P__ showed that he is also experiencing some problems, but not as severe as L__. P__ is in need of a very structured environment at home. Ball stated that P__ had bonded to the nonparents and Mr. J__'s two sons. Removing P__ from that environment would be "emotionally disruptive." Ball also thought it probable that L__ had bonded to Mr. J__'s two sons.

Application of Law to Facts
It is undisputed that the nonparents initiated this suit. The parents' counterclaim, however, makes it clear that they disputed both the voluntariness of the relinquishment and the appointment of the nonparents as being in the best interest of their children. Using the appropriate standards of review, we will review the evidence adduced at trial on each issue to determine whether some evidence and sufficient evidence was presented to support the trial court's judgment.
A. Voluntary Relinquishment
It is undisputed that the initial placement of the children with Mrs. J__ was voluntary. The only issue is whether they remained in her custody involuntarily because Mrs. J__ purposely avoided informing the parents of her and the children's whereabouts. Mrs. J__'s statements that she kept Mrs. S__ informed of her addresses is some evidence that Mrs. S__ knew the children's whereabouts at all times. It is also some evidence that Mr. S__ knew the children's whereabouts because a reasonable inference can be drawn that a wife would tell her husband where their children are. We overrule appellant's no-evidence point regarding the voluntariness issue.
Looking at all the evidence, Mrs. S__ testified that she was never aware of a second Texas address. Mrs. J__, however, testified that she told and wrote Mrs. S__ herself. To bolster her lack of knowledge assertion, Mrs. S__ introduced a letter that was returned as undeliverable. Mrs. J__ received a picture from Mrs. S__, however, that could only have been taken after Mrs. J__ moved back to Texas.
Mr. S__ testified that he tried, unsuccessfully, to locate his children. He did not enlist the aid of any authorities. He stated that he asked his wife several times where the children were, but she would not tell him. Finally, he inquired of several others, but said they also did not tell him. On the other hand, Mrs. J__ stated that she told some of these same persons where she had moved. Ball stated that in his opinion if Mr. S__ really had tried to get this information from his wife, he would have been successful. Finally, Ball's evaluation of Mr. S__ suggested that he might be manipulative and deceptive.
The trial court is the sole judge of the credibility of the witnesses and can accept or reject any witness's testimony. As the fact finder, the trial court acted within its prerogative to settle these factual disputes. We conclude that the evidence is sufficient to support the implied findings that both parents voluntarily relinquished custody of their children to Mrs. J__ for the statutorily required *720 period. We overrule the parents' factual sufficiency challenge regarding the voluntariness issue.
B. Best Interest of the Children
The evidence recounted above is both legally and factually sufficient to support implied findings that the best interests of the children are served by naming the nonparents as managing conservators. Ball's report was some evidence that the nonparents were qualified to serve as managing conservators. He testified that P__ would experience emotional disruption if removed from the nonparents' custody. Despite bonding problems, L__ appeared to be attached to the nonparents' family unit. Even the parents had no complaints about the manner in which their children had been raised by the nonparents.
On these facts, we cannot say that the trial court abused its discretion in finding that the best interests of the children would be served by remaining in the custody of those with whom their parents had voluntarily placed them. We overrule the parents' first point of error.

PUBLIC POLICY
Relying on Pizzitola v. Pizzitola, 748 S.W.2d 568, 569 (Tex.App.-Houston [1st Dist.] 1988, no writ), the parents assert in their second point of error that "[i]t is against public policy to separate siblings from each other." Other than this statement from one case, however, the parents make no other argument to support their proposition. We are unpersuaded.
First, the parents overstate the general rule in this state. It is well settled in Texas that the custody of two or more children of the same marriage should not be divided, except for clear and compelling reasons. Pizzitola, 748 S.W.2d at 569; Zuniga v. Zuniga, 664 S.W.2d 810, 812 (Tex.App.-Corpus Christi 1984, no writ). Our public policy does not bar separating children of the same marriage under all circumstances, but, in fact, allows it in appropriate instances. See, e.g., Zuniga, 664 S.W.2d at 814. Second, to the extent that the parents argue that it should be against public policy to separate siblings, they have failed to cite any authority for that proposition. Appellant's cited authority allows the separation of siblings under appropriate circumstances.
Finally, it is the public policy of this state, as expressed by the legislature, that the overriding consideration in child custody cases is the "best interest of the child." See TEX.FAM.CODE ANN. § 14.07(a) (Vernon 1986). As discussed above, we do not believe that the trial court abused its discretion in separating P__ and L__ from B__ when the record reflects that the parents (1) voluntarily separated these two children from their brother for four years and two years, respectively; (2) permitted them to form familial relationships with the nonparents and Mr. J__'s two children during these periods; and (3) neither visited, wrote, nor supported them for most of these periods. See Herrera, 409 S.W.2d at 399. We conclude that public policy is not offended by the separation of the siblings on these facts.
The parents' second point of error is overruled and the trial court's order affecting parent-child relationship is affirmed.
NOTES
[1] On our own motion, we refer to each party or party-in-interest by initials only. TEX.FAM.CODE ANN. § 11.19(d) (Vernon 1986).
[2] The testimony was uncontroverted that Mrs. S__ was the biological mother of all three children. The evidence was also uncontradicted that Mr. S__ was the biological father of B__ and L__. Although P__ was born to the parents during their marriage, there was some question raised as to the identity of P__'s biological father.
[3] At this time, Mrs. J__ was apparently the common-law wife of the father of Mr. S__'s sister's husband and went by the name C__ G__. Mrs. J__ did not marry Mr. J__ until August 1989. Nevertheless, for simplicity, this opinion shall refer to appellee C__ J__ as "Mrs. J__" regardless of the time period under discussion.
[4] We note that the nonparents did not cite us to a standard of review for this point of error either. Neither did the nonparents challenge the ambiguity of the point of error in their brief.
[5] The parents appear to challenge "findings" contained in the body of the judgment. Such findings are inappropriate and may not be considered on appeal. TEX.R.CIV.P. 299a; Sutherland v. Cobern, 843 S.W.2d 127, 131 n. 7 (Tex. App.-Texarkana 1992, writ denied); Boland v. Natural Gas Pipeline Co., 816 S.W.2d 843, 844 (Tex.App.-Fort Worth 1991, no writ).
[6] Unlike subsection (b)(1), subsection (b)(2) does not require that the appointment of the parents would not be in the best interest of the children. See Tex.Fam.Code Ann. § 14.01(b) (Vernon Supp. 1994); see Lewelling, 796 S.W.2d at 167 (section 14.01(b)(1) requires nonparents to offer evidence of specific actions or omissions by the parents that demonstrate an award of custody to the parents would result in physical or emotional harm to the children). Apparently, subsection (b)(2) was added by the legislature in 1989 to qualify, in certain instances, the very strong parental presumption that had been enacted in 1987 through subsection (b)(1). See John J. Sampson, Texas Family Code Symposium, 21 Tex.Tech.L.Rev. 1326, 1327-28 (1990).
[7] See, i.e., Lewelling, 796 S.W.2d at 167; Brigham, 863 S.W.2d at 762; Thomas v. Thomas, 852 S.W.2d 31, 34 (Tex.App.-Waco 1993, no writ); May v. May, 829 S.W.2d 373, 376 (Tex.App.-Corpus Christi 1992, writ denied); In re W.G.W., 812 S.W.2d 409, 412 (Tex.App.-Houston [1st Dist.] 1991, no writ).
[8] The record reflects that the parents were without a telephone during portions of 1989, 1990, and 1991. Nevertheless, Mrs. S__ and Mrs. J__ telephoned each other through a neighbor of Mrs. S__.