## PREUSSAG AKTIENGESELLSCHAFT, Appellant,

### v.

### Marshall COLEMAN, et al., Appellees.*

### No. 01–99–00502–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

March 30, 2000.

Rehearing Overruled May 5, 2000.

* A complete list of all appellees appears on pages i through xxvi of appellant's brief.

Kathy D. Patrick, Jennifer Horan Greer, Andrew L. Pickens, John Albert Basinger, Houston, for appellant.

Francis I. Spagnoletti, Houston, for appellees.

Panel consists of Justices COHEN, NUCHIA, and DUGGAN.[1]

## OPINION

MURRY B. COHEN, Justice.

Preussag Aktiengesellschaft ("Preussag AG") takes this interlocutory appeal from an order denying its special appearance. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(7) (Vernon Supp.2000). The issue in this appeal is whether a German holding corporation, whose relations with its indirect[2] Texas subsidiaries are virtually its sole Texas contacts, must defend, in a Brazoria County court, a cause of action based on its sales of products to Iraq, when those products were allegedly converted to weapons and later used against American soldiers. We answer this question in the negative. Therefore, we reverse and remand with instructions to dismiss Preussag AG for lack of personal jurisdiction.

---

**1.** The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

**2.** By "indirect subsidiaries," we mean those in which Preussag AG does not directly hold stock, but in which it has a financial interest by virtue of holding stock in another company that, in turn, holds stock in the Texas subsidiary.

## I. Factual and Procedural Background

Appellees are veterans of the 1991 Persian Gulf War and some of their family members. Of the nearly 1800 plaintiffs in this case, approximately 185 are Texas residents. Appellees allege they were exposed to biological and chemical materials in Iraq or Kuwait during the war, resulting in physical and emotional injuries. Appellees maintain that the over 80 defendants, one of which is Preussag AG, sold Iraq the biological, chemical, and other materials that it then used in weapons.

In June 1994, appellees sued the defendants in Brazoria County, Texas, on theories of negligence and product liability. Preussag AG was not yet a defendant. The defendants removed the case to the federal court, where Preussag AG was added as a defendant. Preussag AG moved to dismiss for lack of personal jurisdiction, but Judge Kent dismissed the entire case for lack of subject-matter jurisdiction. *Coleman v. Alcolac*, 888 F.Supp. 1388, 1404 (S.D.Tex. 1995) (order granting motion to dismiss for lack of subject-matter jurisdiction and remanding cause to state court).

On remand, Preussag AG specially appeared. The trial judge denied Preussag AG's special appearance without filing fact findings or legal conclusions. Preussag AG appeals.

## II. Standard of Review and Burden of Proof

We review all evidence to determine if Preussag AG negated all possible grounds for personal jurisdiction. *Garner v. Furmanite Australia Pty., Ltd.*, 966 S.W.2d 798, 802 (Tex.App.—Houston [1st Dist.] 1998, pet. denied). Existence of personal jurisdiction is a question of law, but that determination must sometimes be preceded by the resolution of underlying factual disputes. *James v. Illinois Cent.*

*R.R. Co.*, 965 S.W.2d 594, 596 (Tex.App.—Houston [1st Dist.] 1998, no pet.). When, as here, the trial judge files no fact findings, we presume all factual disputes were resolved to support the judge's decision. *Garner*, 966 S.W.2d at 802. While we generally review for factual sufficiency, we review de novo if the underlying facts are undisputed or otherwise established. *C–Loc Retention Sys., Inc. v. Hendrix*, 993 S.W.2d 473, 476 (Tex.App.—Houston [14th Dist.] 1999, no pet.).

## III. Jurisdictional Test

A court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the Fourteenth Amendment's due process clause[3] and the Texas long-arm statute[4] are satisfied. *CSR, Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex.1996) (orig.proceeding). Because the Texas long-arm statute reaches "as far as the federal constitutional requirements of due process will allow," the statute is satisfied if the exercise of personal jurisdiction comports with federal due process. *Id.*

Federal due process requirements are two-fold. First, the nonresident defendant must have purposefully established such minimum contacts with the forum state that it could reasonably anticipate being sued there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). If the nonresident defendant has purposefully availed itself of the privileges and benefits of conducting business in a state, it has sufficient contacts to confer personal jurisdiction. *Id.* Random, fortuitous, or attenuated contacts do not suffice. *Id.* It is the quality and nature of the contacts, rather than their number, that is important. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 230 n. 11 (Tex.1991). Minimum contacts are particularly important when the defendant is a foreign national because of

---

**3.** U.S. Const. amend. XIV, § 1.

**4.** Tex. Civ. Prac. & Rem.Code Ann. § 17.042 (Vernon 1997).

the unique and onerous burden of defending a suit in a foreign legal system. *Asahi Metal Indus. Co., Ltd. v. Superior Court*, 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987); *CSR, Ltd.*, 925 S.W.2d at 595.

■■■ Minimum contacts analysis is further divided into general and specific personal jurisdiction. *CSR, Ltd.*, 925 S.W.2d at 595. Appellees concede that this is a case of general personal jurisdiction, which requires Preussag AG to show its contacts in Texas were not continuous and systematic. *Id.* To support a finding of general jurisdiction, the defendant's forum activities must have been "substantial," which requires stronger evidence of contacts than for specific personal jurisdiction.[5] *Id.*

Second, if the nonresident defendant has purposefully established minimum contacts with the forum, the exercise of jurisdiction must comport with fair play and substantial justice. *Burger King Corp.*, 471 U.S. at 477, 105 S.Ct. at 2184; *Guardian Royal*, 815 S.W.2d at 231

### IV. Jurisdictional Facts

The following evidence was developed at the special appearance hearing. Preussag AG is a publicly traded German corporation headquartered in Hanover, Germany. It is an investment holding company, with direct and indirect investments in 500 to 600 subsidiaries worldwide. It does not manufacture anything. It is not authorized by the state government of Texas to do business in Texas, and it does not manufacture or sell products, have an office, keep business records, solicit business, own real property, or have an agent for service of process in Texas. Preussag AG did not enter into contracts in Texas for the products it sold to Iraq, and the sales of these products took place entirely outside Texas.

### A. Preussag AG's Six Indirect Subsidiaries in Texas

Preussag AG does, however, own indirect interests in six companies that do business in Texas: (1) Delta Steel, Inc. ("Delta"), (2) Cron Chemical Corporation ("Cron"), (3) Deutag Marketing and Technical Services, Inc. ("DMTS"), (4) PB–KBB Inc., Houston ("PB–KBB"), (5) Pipetronix, Houston ("Pipetronix"), and (6) Triple D Supply Corporation Dallas ("Triple D"). Like many of Preussag AG's worldwide subsidiaries, the indirect Texas subsidiaries are part of what the parties call the "Preussag Group" of companies. Appellees allege that Preussag AG's contacts with these six Texas subsidiaries make it amenable to suit in Texas. Therefore, we discuss these indirect six Texas subsidiaries further below.

### B. The Subsidiaries that were Sued

Besides Preussag AG, appellees also sued five direct or indirect subsidiaries of Preussag AG: (1) Deutshe Tiefbohr AG ("Deutag"); (2) Preussag Handel; (3) Preussag North America ("PNA"), formerly Preussag Industrial Corporation ("PIC"); (4) Preussag Stahl AG ("Stahl"); and (5) Preussag Anlagenbau GmbH ("Anlagenbau"), the only directly owned subsidiary. Although these five subsidiaries were not Texas corporations, they did not contest personal jurisdiction.

Appellees' "live" petition at the time of the hearing alleged that Preussag AG and these five subsidiaries were alter egos of each other for liability purposes, but appellees now admit that these five subsidiaries "are not the foundation of the jurisdictional finding" in this case, through alter ego or agency theory or otherwise. Therefore, we discuss them only insofar as they relate to the six indirect Texas subsidiaries on which appellees' jurisdictional argument rests.

---

**5.** Specific personal jurisdiction exists if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *CSR, Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex.1996).

## C. Preussag AG's Relevant Operational Scheme

Following are what the parties identify as the relevant aspects of the Preussag Group's operational scheme. This operational scheme applies to at least some of the six indirect Texas subsidiaries.

German law requires Preussag AG to publish an annual, consolidated financial statement including the financial information of any subsidiary in which it owns a 50 percent minimum interest. To comply, Preussag AG periodically requests financial information from its subsidiaries. This is sometimes accomplished by the subsidiaries' reporting their information to another Preussag Group company, which then forwards it to Preussag AG; other times, the subsidiaries report directly to Preussag AG.

To prepare these financial reports, some Preussag Group companies, including at least some of the six indirect Texas subsidiaries, use Preussag AG's "Greenbook," which uses standard German accounting procedures. Preussag AG keeps all the reported data in a computer database; therefore, Preussag Group companies receive Preussag AG's Holding Management Handbook on how to enter this data.

Preussag AG has extended lines of credit, made on commercially reasonable terms and at market-rate interest, to some of the Preussag Group companies. It also has certain cash-management procedures for group companies. For example, to facilitate foreign-currency payments by some of its German subsidiaries, Preussag AG has foreign currency accounts through which it makes payments on their behalf. The Preussag Group companies are expected to use these accounts for such payments.

Preussag AG also provides "banking" services to some Preussag Group companies to facilitate intercompany dividend payments, loan repayments, or payments for services and products sold between group companies. These "banking" services are more akin to a debit/credit or clearing-account system. For example, on the subsidiaries' instructions, Preussag AG debits or credits their accounts monthly, depending upon which company bought and which sold goods or services that month. The participating Preussag Group companies also receive a monthly report, like a checking account statement, reflecting the month's debits, credits, and current balance. As part of this system, the participating Preussag Group companies may open new bank accounts only with the approval of Preussag AG's financial department, and excess funds from the participants' bank accounts are transferred daily to Preussag AG. This is not an accounting system, as each subsidiary maintains its own accounting system.

Each Preussag Group subsidiary has its own primary insurance, but Preussag AG's excess liability policy also covers its subsidiaries in which it holds a 50 percent minimum interest. At one time, Preussag AG studied the feasibility of consolidating the total employee benefit package for the Preussag Group's U.S. subsidiaries. A memorandum shows that Preussag AG representatives attended two meetings in 1992 or 1993, one in Florida and the other in Illinois, for this purpose.

Preussag AG sometimes provides administrative assistance to the Preussag Group companies at the companies' cost, *e.g.,* insurance brokerage services, computer support, and project financing for some of the Preussag Group companies' customers.

## D. Specific Preussag AG Contacts with the Six Indirect Subsidiaries in Texas

In addition to the contacts under the Preussag Group's general operational scheme, appellees argue the following contacts between Preussag AG and its six indirect Texas subsidiaries show personal jurisdiction.

### 1. Delta

Delta is a Texas corporation providing general warehousing, offering value-added processing, and producing plates, coil, and tubing. It is owned 55 percent by PNA, which is owned 100 percent by Salzgitter Huttenwork GmbH, which in turn is owned 100 percent by Preussag AG. Delta buys some steel products from, is managed by, and reports to Preussag Handel, which is 100 percent owned by Preussag Stahl, which in turn is owned 99.5 percent (directly or indirectly) by Preussag AG.

Pursuant to Preussag Handel's regulations, Delta submits capital expenditure requests over $40,000 to Preussag Handel for its approval; Preussag Handel in turn submits the requests for Preussag AG's approval. Delta has also provided Preussag AG with proposed capital budgets for approval and comment. Using the Greenbook, Delta reports its financial and related information regularly to Preussag Handel, which sends it to Preussag AG for the annual, consolidated financial statement required by German law. Preussag AG has apparently also transferred funds to Preussag Handel's account on Delta's behalf, under the Preussag Group cash-management system discussed above, to pay for sales from Preussag Handel to Delta.

Appellees also point to the following direct contacts between Preussag AG and Delta. The record contains copies of 11 letters between the two companies from 1993 through 1995. One is a letter asking Delta for a copy of a rent contract and an explanation why certain Delta executives' salaries had increased, although Delta's president testified that Preussag AG's approval was not needed for salary expenditures. Some others concern the reporting for Delta that Preussag AG must compile. Delta's phone records also reflect it made about 35 calls over several years to Hanover, where Preussag AG is headquartered. In 1994, Preussag AG's new board chairman once met in Boston with officers of all U.S. Preussag Group subsidiaries, including Delta's president, to discuss their products, expectations, and performance and the chairman's global philosophy. The only other meeting between Delta and Preussag AG representatives was in 1995, when someone from Preussag AG's corporate development department came to Houston while "visiting various companies to see their operations." Preussag AG once wrote what Delta's president described as a "comfort letter" that could be used in support of loans that Delta's parent company, PIC (now PNA), would take out on Delta's behalf. The letter said Preussag AG would use its influence on PIC to ensure PIC met any obligations under the credit agreements PIC executed for Delta's benefit. We have found no evidence that this comfort letter was written for or sent to Texas banks, and Delta's president testified PIC's lenders at the time were not in Texas. Finally, every few years and at its own expense, Preussag AG sent either its own auditors or those of Price Waterhouse to audit Delta.[6]

## 2. Triple D

Triple D is a Texas corporation that supplies drilling equipment mainly to a Preussag Group drilling company. Triple D is owned by Deutag Friesland BV, which is owned by Deutag. The evidence conflicts whether Preussag AG owns Deutag directly, or whether Deutag is 100 percent owned by Preussag Energie GmbH, which Preussag AG did not fully acquire until 1991. Under its cash-management system described above, Preussag AG has transferred funds to Triple D's Houston bank account on Deutag's behalf, to pay for sales from Triple D to Deutag.

Triple D's audits are sent to Preussag AG's auditors. Triple D now reports its financial information to Deutag, but for a few years during the 1980s, it reported to Preussag AG directly using the Greenbook.

---

**6.** Appellees correctly note that PNA (formerly PIC) extended Delta a $30 million open line of credit. However, this fact does not concern *Preussag AG's* actions, as appellees disavow any attempt to pierce the corporate veil between Preussag AG and PNA.

### 3. PB–KBB

PB–KBB, a Delaware corporation with a Houston office, specializes in subsurface systems and technology. PB–KBB is owned half by a Preussag Group company (KBB) and half by a company outside the Preussag Group. Preussag AG has extended lines of credit to PB–KBB at market-rate interest. Some of these loans were deposited into PB–KBB's Texas bank account. The record contains several faxes and memoranda of phone conversations discussing potential or actual loans from Preussag AG to PB–KBB from 1987 to 1992. There was contrary testimony from PB–KBB's vice-president of finance that PB–KBB did not borrow from Preussag AG, but we presume the judge found it did, as there were no fact findings to settle this conflicting evidence. The record also shows that PB–KBB sometimes requested to borrow or got loans from (1) Preussag Finance BV, (2) an undefined "Preussag," and (3) PIC (now PNA), as well. Preussag AG once sent its own auditors, and another time sent those of Price Waterhouse, to audit PB–KBB.

### 4. Pipetronix

Pipetronix is a Texas corporation that offers pipeline inspections and cleaning services in the U.S. mainly for Pipetronix GmbH. Pipetronix became part of the Preussag Group in 1991 and is a wholly owned subsidiary of PNA, a corporation headquartered in Chicago that is the holding company for most of the Preussag Group's U.S. companies. Pipetronix's phone records show it called Germany very often over several years. A Pipetronix officer testified many calls were likely to Pipetronix GmbH, located in Karlsruhe, Germany, because the two companies frequently spoke by phone, but it appears that roughly a third were to Hanover, where both Preussag AG and Anlagenbau were headquartered in the same building. Because Anlagenbau is the parent of Pipe-

tronix GmbH, for which Pipetronix provides services, the same Pipetronix officer speculated that his office might have sometimes called Anlagenbau, but Preussag AG did not show how many of the calls to Hanover were to it or to Anlagenbau. Using the Greenbook, Pipetronix provides its financial reports to PNA, which forwards them to Preussag AG. Finally, to show Preussag AG's "pervasive" control over Pipetronix, appellees rely on the following testimony of a Pipetronix officer, explaining how he had heard of Preussag AG:

> I suppose daily in conversation—not daily, but in conversation around the office, obviously there's reference to who Preussag [AG] is, but not ever in any relationship as to any reporting to them or anything.... I think it's more an identity thing, as far as we're concerned, in that Preussag [AG] is the big mother in the sky up there somewhere, you know, and I think we can all identify that we are a part of the Preussag AG companies, but other than that, no relationship at all.[7]

### 5. DMTS

DMTS has offices in Houston and is owned by Deutag. Deutag and DMTS, which markets drilling services, conduct drilling business in the U.S. A deposit slip indicates that Preussag AG paid some of DMTS's invoices to Deutag, depositing funds into DMTS's Texas bank account.

### 6. Cron

Cron is a Texas company that is owned by Amalgamet, Inc. Using the Greenbook, Cron reports its financial and operations information to Amalgamet's London office, which sends the information to Preussag AG for the annual, consolidated financial statement required by German law. Deloitte & Touche prepares Cron's year-end account for Preussag AG.

---

7. Appellees' brief correctly states that PNA extended Pipetronix a line of credit. However, this fact does not concern *Preussag AG's* actions, as appellees disavow any attempt to pierce the corporate veil between Preussag AG and PNA.

### E. Other Actions by Preussag AG

#### 1. Contracts

In 1986, Preussag AG sold its stock in Preussag Oil & Gas back to the corporation. The agreement recites it is "governed by the laws of the State of Texas."

In 1992, PB–KBB merged into Preussag Oil & Gas. The agreement recited that these two companies had approved the merger "pursuant to the Texas Business Corporation Act." Preussag AG also signed the agreement, but solely as indemnitor for pre-merger environmental liability of Preussag Oil & Gas, its former indirect subsidiary. The agreement was to be "governed by, and construed in accordance with, the laws of the State of Texas."

#### 2. Texas Attorneys

From about 1986, Vinson & Elkins's Houston office performed various services for Preussag AG or its subsidiaries. For example, the two contracts discussed above were possibly executed with the firm's assistance, as copies of the agreements were in its records.

Appellees first point to around 27 invoices for the firm's services from 1986 to 1993, some including fairly substantial fees. Some invoices were billed to Preussag Oil & Gas's account, but most were billed to that of "Preussag AG," showing a Houston address. However, it appears the vast majority of these invoices were mailed to *Preussag Oil & Gas* in Houston, not Preussag AG, or were for services that could have been rendered only for the former. The record also contains a 1990 phone message instructing that invoices should be billed to the account of "Preussag Oil & Gas," not "Preussag AG." Nevertheless, because there are no fact findings, we must presume the trial judge found that at least the few invoices that (1) were not mailed to Preussag Oil & Gas or (2) did not itemize services that could have

been performed only for Preussag Oil & Gas were for the firm's work for Preussag AG.

Appellees also point to about 16 items of correspondence between Preussag AG and the firm from 1993 to 1996. Some of these referenced travel plans or meetings, a few were personal, and others concerned an attorney's service on PNA's board after this lawsuit was filed. In 1996, Preussag AG agreed to hold that attorney harmless from liability he might incur as a PNA board member.

## V. Discussion

Because the Texas long-arm statute reaches as far as federal due process allows, we need examine only whether the exercise of personal jurisdiction over Preussag AG comports with federal due process. *See CSR, Ltd.,* 925 S.W.2d at 595.

Appellees argue that Preussag AG is subject to Texas's general jurisdiction because Preussag AG (1) has a close business relationship with its six indirect Texas subsidiaries, (2) once wrote a comfort letter on one's behalf, (3) twice contracted with Texas entities, and (4) employed a Houston law firm. Under these facts, we disagree.

### A. Preussag AG's Relationship with its Six Indirect Texas Subsidiaries

Appellees disavow any alter ego[8] or agency theory of personal jurisdiction, *i.e.,* they do not attempt to impute the six indirect Texas subsidiaries' activities to Preussag AG. Rather, they focus on Preussag AG's normal, corporate actions within the Preussag Group system—such as occasional audits; unified financial procedures for the annual reporting required by German law; a unified "banking" system, involving loans and intercompany payments and requiring some deposits into the sub-

---

**8.** The alter ego theory generally allows one corporation's actions to be ascribed to another by disregarding their distinct corporate entities. *See, e.g., Lucas v. Texas Indus., Inc.,* 696 S.W.2d 372, 374 (Tex.1984) (corporate form normally not disregarded absent its use for fraudulent purposes, to avoid liability, or under like exceptional circumstance).

sidiaries' Texas bank accounts; parent approval of large expenditures and budgets; consideration of adopting a group benefits system; and the communications and visits that accompany these activities—directed at these six indirect Texas subsidiaries.

### 1. Texas and Fifth Circuit Case Law: Personal Jurisdiction over Nonresident Parent Corporation

In support, appellees rely on four Texas or Fifth Circuit cases for the proposition that a "close business relationship" between a foreign parent company and its Texas subsidiary can justify subjecting the parent to Texas jurisdiction. *See Conner v. ContiCarriers & Terminals, Inc.,* 944 S.W.2d 405, 418 (Tex.App.—Houston [14th Dist.] 1997, no writ) (plurality opinion); *3–D Elec. Co. v. Barnett Constr. Co.,* 706 S.W.2d 135, 139 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); *Hargrave v. Fibreboard Corp.,* 710 F.2d 1154, 1159 (5th Cir.1983) (Texas); *Walker v. Newgent,* 583 F.2d 163, 167 (5th Cir.1978) (Texas). However, the court in each of these cases was performing an alter ego analysis to pierce the veil between parent and subsidiary:[9]

> Arguing that ContiCarriers is the "alter ego" of its parent company, Continental Grain, the Conners contend that Continental Grain's Texas contacts should be imputed to ContiCarriers. ContiCarriers is the wholly owned subsidiary of Continental Grain, which operates several grain elevators and maintains offices in Texas. *Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state simply because*

*its subsidiary is present or doing business there.* The mere existence of a parent-subsidiary relationship is not sufficient to warrant the assertion of jurisdiction over the foreign parent. *In some circumstances a close relationship between a parent and its subsidiary may justify a finding that the parent "does business" in a jurisdiction through the local activities of its subsidiaries. The rationale for such an exercise of jurisdiction is that the parent corporation exerts such dominance and control over its subsidiary "that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction."* These principles apply not only in the situation where jurisdiction is sought over the parent corporation through its subsidiary's local activities, but also when jurisdiction is sought over the subsidiary through its parent corporation.

*Conner,* 944 S.W.2d at 418 (citations omitted, emphasis added); *accord 3–D Elec.,* 706 S.W.2d at 139 (applying same analysis to determine whether two companies, which were not parent and subsidiary, were each other's alter ego); *Hargrave,* 710 F.2d at 1159 (applying same rule in alter ego analysis); *Walker,* 583 F.2d at 167 (same).[10] These cases do not create a rule that, outside an alter ego situation, a parent's normal relationship with its subsidiary, pursuant to an overarching system that is not directed at any particular state,

---

**9.** Moreover, each court found there was no jurisdiction over the parent corporation under an alter ego theory.

**10.** *Accord, see Garner v. Furmanite Australia Pty., Ltd.,* 966 S.W.2d 798, 802 (Tex.App.—Houston [1st Dist.] 1998, pet. denied); *McFee v. Chevron Int'l Oil Co.,* 753 S.W.2d 469, 471 (Tex.App.—Houston [1st Dist.] 1988, no writ); *Jones v. Beech Aircraft Corp.,* 995 S.W.2d 767, 771–72 (Tex.App.—San Antonio 1999, pet. dism'd); *Alpine View Co. Ltd. v. Atlas Copco AB,* No. 97–20879, at 214 (5th Cir. 2000) (op. on remand) (Texas); *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 492–93 (5th Cir.

1974) (Texas); *Murdock v. Volvo of Am. Corp.,* 403 F.Supp. 55, 56–57 (N.D.Tex.1975) (Texas). *Cf. Vosko v. Chase Manhattan Bank, N.A.,* 909 S.W.2d 95, 99–100 (Tex.App.—Houston [14th Dist.] 1995, writ denied) ("Similarly, jurisdiction over an individual generally cannot be based on jurisdiction over a corporation with which he is associated unless the corporation is the alter ego of the individual."); *Solow v. Century Assets Corp.,* 12 S.W.3d 512, 515–16 (Tex.App.—Beaumont 1999, no pet.) (same); *Stuart v. Spademan,* 772 F.2d 1185, 1196–97 (5th Cir.1985) (Texas) (same).

suffices to subject the parent to jurisdiction in its subsidiary's state.

In fact, *Conner* implies the opposite. *See id.,* 944 S.W.2d at 417–19. In *Conner,* it was undisputed that the two corporations maintained "significant ties," including the sharing of headquarters outside Texas; a unified payroll and benefits system; the Texas parent's provision of legal, accounting, and other services to the nonresident subsidiary; and the fact that 50 percent of the subsidiary's revenue came from servicing the parent corporation. *Id.* at 419. The plaintiffs argued both that (1) the nonresident subsidiary had direct contacts with Texas and (2) its Texas parent's actions could be imputed to the nonresident subsidiary under an alter ego theory. *Id.* Nonetheless, in discussing the subsidiary's *direct* contacts with Texas, neither the plaintiffs nor the court considered the nonresident subsidiary's everyday relations (unified benefits and payment systems, intercompany services, profit flow, etc.) with its Texas parent. *See id.* at 417. Rather, they considered these parent-subsidiary contacts only in connection with the *alter ego* analysis. *See id.* at 418–19. Although the case was not decided on this point, we would expect that, if such routine parent-subsidiary contacts were important in determining the nonresident subsidiary's *direct* contacts with Texas, someone in *Conner* would have said so. No one did.

*Bearry v. Beech Aircraft Corporation* is also instructive. 818 F.2d 370 (5th Cir. 1987). In *Beech,* the survivors of two individuals killed in a Beech aircraft in Mississippi sued Beech in Texas on product liability theories. *Id.* at 372. Beech engaged in a nationwide marketing campaign, during which nearly $250 million of its products flowed to 17 independent Texas dealers. *Id.* at 373. Beech representatives occasionally visited the Texas dealers at the dealers' request. *Id.* One of the Texas dealers was a wholly owned subsidiary of another Beech subsidiary. *Id.* Regarding this "indirect" Texas subsidiary, the *Beech* court noted that "because [the indirect

subsidiary] is operated as a distinct corporation, the district court properly held that its contacts with Texas could not be imputed to Beech." *Id.* However, the district court had also characterized the independent Texas dealers as "Beech retailers," implicitly attributing their activities to Beech, despite Beech's lack of control over their operations. *Id.* at 375 & n. 2 ("Although the district court noted that the activities of the independent dealers could not be attributed to Beech, it found the existence of the distribution system in Texas to establish conduct by Beech within that forum."). The district court had further characterized all aircraft sales to Beech's Texas dealers as occurring in Texas, although all sales were negotiated and completed in Kansas. *Id.* at 375. The Fifth Circuit Court of Appeals rejected these two characterizations:

> But Beech exercised its right to structure its affairs in a manner calculated to shield it from the general jurisdiction of the courts of other states such as Texas, carefully requiring the negotiation, completion, and performance of all contracts in Kansas. Beech has not afforded itself the benefits and protections of the laws of Texas, but instead has calculatedly avoided them.

*Id.* at 375–76. It further held that "distributors selling Beech manufactured products for their own account do not create minimum contacts sufficient to warrant general jurisdiction over Beech. *Id.* at 376. Beech has no office in Texas, has no agents in Texas, and has no control over the Texas dealers. *Id.* at 377. As such, Beech is not 'doing business' in Texas." *Id.* at 376. We conclude that *Beech* generally supports Preussag AG's position.

*Dalton v. R & W Marine, Inc.* also supports Preussag AG's position. 897 F.2d 1359 (5th Cir.1990). *Dalton* involved the Louisiana long-arm statute, which, like that of Texas, extended to the limits of due process. *Id.* at 1361. In *Dalton,* the plaintiff sued his employer. *Id.* at 1360. He also sued Hartley Marine Corporation,

of which the plaintiff's employer was an unincorporated division, and Midland Enterprises, Hartley's nonresident parent corporation. *Id.* at 1360–61. Midland was a holding company with multiple subsidiaries, including five incorporated under Louisiana law and four licensed to do business there. *Id.* at 1361. Midland had no employees, offices, or property in Louisiana, and it did not conduct business there. *Id.* However, Midland owned most of the vessels its Louisiana subsidiaries used, bareboat chartered [11] the vessels to them (yielding about 12.9 percent of Midland's total revenues), advertised nationally, and sometimes bought vessels at marshals' sales within the state. *Id.*

The plaintiff argued that Midland was subject to Louisiana's general jurisdiction because it (1) had direct contacts with Louisiana and (2) was the alter ego of its subsidiaries. *Id.* In rejecting the first argument (direct contacts), the *Dalton* court held as follows:

> Dalton asserts that Midland bareboat charters its boats to its Louisiana subsidiaries . . ., engages in advertising that reaches Louisiana, and has purchased vessels at marshals' sales within the state. These contacts, however, are not sufficiently systematic and continuous to constitute a general presence in the state. The strongest support for jurisdiction is Midland's bareboat charters, which by definition vest most of the incidents of ownership in the charterer operating the vessel. Although Midland's continued ownership of these vessels presents a somewhat more "continuous and systematic" presence in the state than Beech's airplane sales in *Bearry*, like Beech, Midland takes care that these charters are entered into, and payments made pursuant to them are remitted, in Cincinnati. A corporation's

"obvious intent to exercise its due process rights" should not be disregarded lightly.[12]

*Id.* at 1362 (internal citations omitted). In short, the direct contact analysis included such things as bareboat chartering contracts with the subsidiaries, but did not include the type of intercorporate activities, such as unified banking and benefit schemes and communications, on which appellees rely to show Preussag AG's general presence in Texas. In contrast, when the *Dalton* court rejected the second argument (alter ego), it considered these contacts:

> Several factors point to Midland as the alter ego of its subsidiaries. Midland owns 100% of its subsidiaries and remains responsible for general policy. Its subsidiaries funnel their revenues into centralized bank accounts and file a consolidated federal tax return with Midland. Finally, Midland offers benefit plans to its subsidiaries' employees. Nonetheless, these factors are outweighed, albeit modestly, by the fact that Midland observes corporate formalities, makes its subsidiaries responsible for daily operations including all personnel decisions, and allows each subsidiary to keep its records and accounts in separate books and file its own state tax return. Having concluded that Midland cannot be considered the alter ego of its subsidiaries, we need not address whether Hartley can be considered the alter ego of Midland.

*Id.* at 1363. *Dalton* indicates that the type of parent-subsidiary contacts appellees rely on to show jurisdiction over Preussag AG—such as unified banking and benefits schemes, *i.e.*, those routinely occurring under the overall Preussag Group system—are more properly considered as part of an

---

**11.** A bareboat charter vest most incidents of ownership in the charterer operating the vessel. *Id.* at 1362.

**12.** The Dalton court also held that neither Midland's advertising, the emphasis of which

was national, nor its vessel purchases, for which the sale contracts were executed, paid, and delivered outside Louisiana, provided for jurisdiction. *Id.* at 1362 n. 3.

alter ego analysis, rather than as examples of Preussag AG's direct contacts with Texas. *See also Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000) (op. on remand) (holding (1) foreign holding company was not subject to Texas jurisdiction because of its subsidiaries' activities there absent alter ego showing; (2) considering holding company's receipt of dividends from, interest-bearing loans to, and percentage ownership in subsidiaries only in alter ego analysis; and (3) concluding no alter ego showing was made).

## 2. Other Jurisdictions' Case Law: Personal Jurisdiction over Nonresident Parent Corporation

Appellees rely on four decisions of the federal district court for the eastern district of Wisconsin, each of which we distinguish. In *Handlos v. Litton Industries, Inc.*, the court considered whether two wholly owned subsidiaries, which plaintiff served with process on behalf of their nonresident parent corporation, were the parent's agents or alter egos, so that the parent was "doing business" under the Wisconsin long-arm statute through them. 304 F.Supp. 347, 348 (E.D.Wis.1969). The *Handlos* court concluded there was sufficient evidence of both, and it denied the motion to dismiss. *Id.* at 350–51. Here, in contrast, appellees disavow either agency or alter ego theory.

Appellees also rely on *Hayeland v. Jaques*, in which there was federal-question jurisdiction based on federal statute. 847 F.Supp. 630, 632 (E.D.Wis.1994). The *Hayeland* court first noted that, when a federally created right is at issue, the Fifth Amendment's due process clause applies, rather than that of the Fourteenth Amendment. *Id.* It then adopted the minority view that, to determine personal jurisdiction when a federal question is involved, the court need look only to a defendant's "national contacts," rather than to its contacts with the state in which the federal court sits:

> When exercising the power of the national sovereign, logic suggests that a federal court is not limited by the same constitutional concerns that limit the power of a state sovereign. Of course, a forum state's long-arm statute must still be satisfied.... But once the requirements of the long-arm statute are met, the only due process concern should be whether the defendant has sufficient *national contacts* such that the exercise of jurisdiction by the nation's courts under the nation's laws does not offend traditional notions of fair play and substantial justice. *Here, it is clear that [the nonresident defendant] has extensive contacts with the United States.* The only remaining question is whether jurisdiction is satisfied under Wisconsin's long-arm statute.

*Id.* at 634 (emphasis added). The *Hayeland* court then concluded that the nonresident defendant was amenable to suit under the Wisconsin long-arm statute through the actions of its Wisconsin subsidiary, because case law interpreting that statute had held a subsidiary's actions could be so considered.[13] *Id.* In contrast, a "national contacts" analysis does not apply in state court, and *Hayeland* was decided under statute, not the due process clause.

Appellees next rely on *Brunswick Corp. v. Suzuki Motor Co., Ltd.*, in which a Wisconsin manufacturer sued two Japanese manufacturers for patent infringement. 575 F.Supp. 1412, 1415 (E.D.Wis. 1983). The Japanese companies sold products other than those at issue in the suit through partially or wholly owned U.S. subsidiaries, which in turn made substantial sales of these products in Wisconsin. *Id.* at 1415–16. The *Brunswick* court held as follows:

**13.** The Wisconsin long-arm statute provided for jurisdiction over a defendant that "is engaged in substantial and not isolated activities within this state, *whether such activities are*

*wholly interstate, intrastate, or otherwise."* Wis. Stat. § 801.05(1)(d) (1994) (emphasis added).

This court believes that the constitutional analysis under *International Shoe [v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)] permits consideration of a nonresident defendant's contacts with the forum state through its wholly owned subsidiaries without regard to whether the affiliated corporations have maintained a formal separation of corporate identities. Thus, *Cannon*[14] does not preclude this Court from considering the Wisconsin contacts of the [two Japanese parent corporations'] subsidiaries in judging the fairness under the due process clause of requiring the Japanese parents to defend themselves in this forum.

*Id.* at 1419. Without using agency or alter ego theories, the *Brunswick* court then held that, considering the *subsidiaries'* activities, it could exercise jurisdiction over the *parent* corporations under both the Wisconsin long-arm statute and the due process clause. *Id.* at 1422–23. We distinguish *Brunswick* in that the parent corporations there were using their subsidiaries to market and sell the parents' products, while here, Preussag AG is not marketing anything through its Texas subsidiaries. *See id.* at 1415–16. To the extent *Brunswick* is not distinguishable, though, we find it contrary to the Texas precedent cited above, requiring alter ego or agency theory for a subsidiary's actions to be attributed to the parent for jurisdictional purposes. *See Conner,* 944 S.W.2d at 418; *McFee v. Chevron Int'l Oil Co., Inc.,* 753 S.W.2d 469, 471 (Tex.App.—Houston [1st Dist.] 1988, no writ); *Beech,* 818 F.2d at 375–76. *Cf. 3–D Elec.,* 706 S.W.2d at 139 (applying same rule between two corporations that were not parent and subsidiary).

Appellees also rely on *Johnson Worldwide Associates, Inc. v. Brunton Co.,* which involved a 15–year licensing agreement between two unrelated corporations—one of which was a resident (Johnson Worldwide) and one of which was not (Silva, Brunton's parent)—under which the parties' business dealings were extensive. 12 F.Supp.2d 901, 904–05, 907–08 (E.D.Wis.1998). In fact, because the dispute arose out of the termination of that licensing agreement, the *Johnson* court held it also had specific, as well as general, personal jurisdiction over the nonresident corporation. *Id.* at 911. *Johnson Worldwide* is, therefore, distinguishable.

Finally, appellees cite *Lung v. Yachts International, Ltd.,* in which the court determined it had specific jurisdiction—a less rigorous test—over a nonresident that allegedly breached a contract and defrauded Wisconsin state residents. 980 F.Supp. 1362, 1367–68 (D.Hawai'i 1997). *Lung* is likewise distinguishable.

### 3. Application

We conclude that Preussag AG's routine activities within the Preussag Group system with its six indirect Texas subsidiaries do not make Preussag AG amenable to suit in Texas.

The six indirect Texas subsidiaries' use of Preussag AG's "banking" and financing systems does not show Preussag AG's purposeful contacts with Texas. Preussag AG's services were provided to the six indirect Texas subsidiaries as they would be to any member of the Preussag Group in any location. In *Primera Vista S.P.R. de R.L. v. Banca Serfin, S.A. Institucion de Banca Multiple Grupo Financiero Serfin,* the court held a Mexican bank's (1) $1.5 billion in "pass-through" accounts in 11 U.S. banks, through which it facilitated its Mexican clients' foreign transactions, and (2) lines of credit the Mexican bank maintained with Texas banks, but which were used only to support the Mexican bank's clients that imported U.S. goods, did not result in general jurisdiction. 974

---

**14.** *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925).

S.W.2d 918, 926 (Tex.App.—El Paso 1998, no pet.). The *Primera Vista* court reasoned as follows:

> Although Banca Serfin charged its Mexican customers for use of the Texas bank accounts and lines of credit, its maintenance and use of the accounts is more in the nature of facilitating its Mexican customers' business activities. Accordingly, there was evidence from which the trial court could have reasonably concluded that Banca Serfin's Texas accounts are a by-product of Banca Serfin's business in Mexico with Mexican importer customers rather than an indication of any substantial, purposeful business activity conducted by Banca Serfin on its own behalf in Texas. By maintaining and charging for the use of the Texas accounts, Banca Serfin clearly conducts some marginal business activity in the state. This activity alone, however, is somewhat attenuated and not substantial enough to subject Banco Serfin to suit in Texas for all purposes.

*Id.* at 926. Like the pass-through accounts of the Mexican bank in *Primera Vista*, Preussag AG's "banking" system—in which Preussag Group members deposit excess funds daily with Preussag AG, Preussag AG lends money on commercial terms, Preussag AG credits and debits members' accounts for inter-member sales, and foreign currency transactions are conducted—exists to accommodate the whole Preussag Group, of which Preussag AG is a part. The fact that Preussag AG deposits funds under this system in some subsidiaries' Texas bank accounts is a fortuitous contact, since the "banking" system is not itself directed toward Texas. *Cf. Alpine View*, at 214 (in holding foreign holding company's Texas subsidiaries were not its alter ego and, thus, Texas had no jurisdiction over former, stating, "The existence of intercorporate loans does not establish the requisite [alter ego] dominance,

and, in fact, interest-bearing loans suggest separation of corporate entities.") (citations omitted). Therefore, we conclude that Preussag AG did not purposefully avail itself of conducting business in Texas.

Neither do we place much weight on the communications between some of the six indirect Texas subsidiaries and Preussag AG. In all, appellees' brief cites to fewer than 60 written communications—including currency exchange and deposit confirmations—among Preussag AG and all six Texas subsidiaries from 1987 to 1995. Many of these written communications concerned the financial reporting required by German law, periodic audits, or loans under the Preussag Group "banking" system, all of which we consider part of the normal relations between this parent and its subsidiaries. For the same reason, it is not surprising that Preussag AG and Delta and Pipetronix would communicate by phone.[15]

Aside from occasional visits of Preussag AG representatives for audits, and once for an inspection of Delta, the only other visits between Texas subsidiaries' personnel and that of Preussag AG were outside of Texas. Occasional travel to Texas is insufficient by itself to establish continuous and systematic contact. *See Garner*, 966 S.W.2d at 803 (holding no general jurisdiction over individual who made eight to 10 visits over 60 days to Texas); *compare Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418, 104 S.Ct. 1868, 1870, 1874, 80 L.Ed.2d 404 (1984) (finding no general personal jurisdiction despite defendant corporation's sending management and personnel to Texas for consultation and training over seven-year period). Moreover, we perceive Preussag AG's monitoring of its six indirect Texas subsidiaries through periodic audits, and its approval of Delta's large

---

15. Moreover, Delta called Hanover (presumably Preussag AG) only about 35 times over several years, and we cannot discern how many of Pipetronix's calls to Hanover were to Preussag AG or to Anlagenbau, the latter of which Pipetronix's officer speculated his company might have sometimes called.

expenditures, as part of the normal, parent-subsidiary relationship between these companies.

The fact that the six indirect subsidiaries reported financial information that was relayed to Preussag AG does not weigh in favor of finding jurisdiction, either. This information was required by German law, not just for Preussag AG's own benefit, and was apparently part of the normal parent-subsidiary relationship under the Preussag Group system. Neither is it surprising that Preussag Group companies would use a unified software and reporting system to compile this information. This activity was directed at *all* subsidiaries in which Preussag AG had at least a 50 percent interest, not just at subsidiaries in Texas. The mere existence of a unified, international system between a parent and its subsidiaries does not show purposeful availment of Texas's benefits.

Finally, the excess liability policy Preussag AG maintains for its subsidiaries benefits them, not it, and does not show purposeful availment of anything in Texas.

## B. Preussag AG's Comfort Letter

■ Preussag AG wrote a "comfort letter" that could be used in support of loans that *PNA* might take out on Delta's behalf. There is no showing the letter was written to or for a Texas lender, as Delta's president testified none of PIC's lenders was in Texas, and there is nothing systematic or continuous about it in any event.

## C. Preussag AG's Two Contracts

■ We do not find Preussag AG's contracting twice, six years apart, with Texas corporations to show systematic and continuous contact with Texas.

Mere contracting with a Texas resident does not satisfy the minimum contacts requirement. *See, e.g., Magnolia Gas Co. v. Knight Equip. & Mfg. Corp.*, 994 S.W.2d 684, 691 (Tex.App.—San Antonio 1998, no pet.) (contract dispute). In the 1986 transaction, Preussag AG sold back its stock in Preussag Oil & Gas. If anything, this shows Preussag AG's desire to distance itself from Texas. Likewise, the 1992 merger was between PB–KBB and Preussag Oil & Gas. Appellees rely on the agreement's reference to the Texas Business Corporation Act, but it was *PB–KBB and Preussag Oil & Gas*, not Preussag AG, that recited they were merging pursuant to that act. Preussag AG signed the agreement not as a principal, but as an indemnitor for pre-merger environmental liability of its former indirect subsidiary. In doing so, Preussag AG assumed liability related to a Texas merger; it did not avail itself of any privileges or benefits of doing business in Texas.

■ Each contract contained a choice-of-law clause, *but only for matters relating to those contracts*. A choice-of-law provision is a consideration. *See Burger King*, 471 U.S. at 482, 105 S.Ct. at 2187; *Project Eng'g USA Corp. v. Gator Hawk, Inc.*, 833 S.W.2d 716, 722 (Tex.App.—Houston [1st Dist.] 1992, no writ) (contract containing choice-of-law and choice-of-forum clauses). However, standing alone, it cannot suffice to confer jurisdiction. *See Burger King*, 471 U.S. at 482, 105 S.Ct. at 2187. Nor does it indicate a voluntary submission to the personal jurisdiction of the state's courts in the absence of any express understanding to that effect. *3–D Elec.*, 706 S.W.2d at 145 n. 9. Here, if these choice-of-law clauses showed voluntary submission at all, they showed it only for disputes arising from those two particular contracts.[16]

---

16. We realize the *Gator Hawk* court considered, in determining personal jurisdiction, a choice-of-law provision in a contract that was not the subject of that suit, but we distinguish that case because (1) the contract also contained a choice-of-forum clause, (2) the defendant had more direct contacts with Texas than Preussag AG did, and (3) the defendant put on little proof to carry its burden. *See Project Eng'g USA Corp. v. Gator Hawk, Inc.*, 833 S.W.2d 716, 720–21 (Tex.App.—Houston [1st Dist.] 1992, no writ).

### D. Preussag AG's Retention of a Houston Law Firm

█ Although the majority of the law firm's invoices were sent to or were for services for Preussag Oil & Gas, we must presume the trial judge found that a few of the firm's services were performed for Preussag AG. However, we conclude that these services do not amount to substantial or systematic and continuous contact with Texas. *Cf. Wilson v. Belin,* 20 F.3d 644, 650–51 (5th Cir.1994) (holding no general personal jurisdiction in a defamation suit despite nonresident's carrying legal malpractice insurance through a Texas law firm for less than a year, performing at least one legal project a year over three years for various Texas law firms, and being a pro bono consultant of a Texas historical society for several years). *Contrast Commonwealth of Puerto Rico v. SS ZOE COLOCOTRONI,* 628 F.2d 652, 667–68 (1st Cir.1980) (holding general personal jurisdiction existed over British insurers when (1) ships insured by them were involved, in the forum's waters, in numerous incidents giving rise to claims; (2) the insurers' local law firm, acting as the insurers' local correspondent, was instructed to take actions to forestall claims, to provide services for insured shipowners, or to prepare for litigation; and (3) the insurers advertised to their insured shipowners that the above services would be available through this law firm).

Additionally, some of the contacts with Vinson & Elkins are irrelevant because of when they took place. Federal authority indicates that contacts occurring after suit is filed are irrelevant because "district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances—up to and including the date the suit was filed—to assess whether they satisfy the 'continuous and systematic' standard." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 569–70 (2nd Cir.1996); *see also Noonan v. Winston Co.,* 135 F.3d 85, 94–95 (1st Cir.1998); *Asarco, Inc. v. Glenara, Ltd.,* 912 F.2d 784, 787 n. 1 (5th Cir.1990); *Haas v. A.M. King Indus., Inc.,* 28 F.Supp.2d 644, 648 (D.Utah 1998). Some Texas authority implies that the relevant contacts are those up to the time of the injury. *See Scott v. Huey L. Cheramie, Inc.,* 833 S.W.2d 240, 242 (Tex.App.—Houston [14th Dist.] 1992, no writ); *Middleton v. Kawasaki Steel Corp.,* 687 S.W.2d 42, 45 (Tex.App.—Houston [14th Dist.] 1985), *writ ref'd n.r.e.,* 699 S.W.2d 199 (Tex.1985). Whether the cutoff date for determining general jurisdiction is the date of the injury or the date the suit is filed, the result is the same: the majority of the 16 items of correspondence between Preussag AG and Vinson & Elkins were generated after this suit's filing and are irrelevant to the jurisdictional inquiry. Similarly, a Vinson & Elkins's attorney's post-petition service on PNA's board is irrelevant and, in any event, would not show *Preussag AG's* purposeful availment of anything in Texas. Likewise, Preussag AG's post-petition promise to hold that attorney harmless in that position would be neither relevant nor, if relevant, "continuous and systematic."

### E. Resolution

We hold that Preussag AG did not purposefully establish minimum contacts with Texas on a continuous and systematic basis. Therefore, we hold Texas courts have no jurisdiction over it. Because we conclude that no general personal jurisdiction exists over Preussag AG, we need not decide whether exercise of that jurisdiction would comport with notions of fair play and substantial justice. *See, e.g., Reyes v. Marine Drilling Cos.,* 944 S.W.2d 401, 405 (Tex.App.—Houston [14th Dist.] 1997, no writ).

### VI. Conclusion

We reverse the order denying Preussag AG's special appearance and remand with

instructions to dismiss Preussag AG for lack of personal jurisdiction.