Opinion Issued March 6, 2003                                        















In The
Court of Appeals
For The
First District of Texas




NO. 01-02-00661-CV
____________

PET-JA, S.A., Appellant

V.

SHELL COMPAÑIA ARGENTINA DE PETROLEO, S.A., Appellee




On Appeal from the 295th District Court 
Harris County, Texas
Trial Court Cause No. 2000-30800 




MEMORANDUM OPINION
          This is an interlocutory, accelerated appeal by appellant, Pet-JA, S.A. (Pet-JA),
from the trial court’s granting of a special appearance filed by appellee, Shell
Compañia Argentina de Petroleo, S.A. (Shell CAPSA). See Tex. Civ. Prac. & Rem.
Code Ann. § 51.014(a)(7) (Vernon Supp. 2003). In 12 issues, we determine whether
the trial court erred by granting Shell CAPSA’s special appearance as to Pet-JA’s
intervention in the suit between Reef Exploration, Inc. (Reef) and Shell CAPSA. We
affirm.
Background
          This case involves the sale of stock in a company that had rights to explore and
produce hydrocarbons in Argentina. On February 28, 1995, Reef entered into a
“Participation Agreement” with Hinton Production Company (Hinton), W.B. Hinton
Drilling Co., Inc., Hinton Argentina, S.A., and Pet-JA to obtain a 100% working
interest for the exploration and subsequent production of hydrocarbons on the Rio
Colorado Block in Argentina. Reef, a Texas corporation, assigned its interest to Reef
Argentina, S.A. (RASA), an Argentine subsidiary of Reef. All of the revenue interest
was transferred to RASA.
          In October 1996, Compañia General de Combustibles, S.A. (CGC) entered into
a joint venture with RASA in the Rio Colorado Block. On October 22, 1996, Pet-JA,
Reef, RASA, CGC, and others amended the Participation Agreement, granting CGC
a 45% working interest in the Rio Colorado Block. In May 1998, Pet-JA entered into
an option agreement with CGC, whereby Pet-JA obtained the option to acquire 5%
of CGC’s 45% participating interest in the Rio Colorado Block. 
          In November 1997, CGC and RASA discussed bringing in additional parties
to bear the substantial cost of developing the Rio Colorado Block. In December
1997, CGC informed Reef and RASA that Shell CAPSA was interested in the Rio
Colorado Block. The parties decided to solicit offers from all interested companies. 
On March 23, 1998, Shell CAPSA submitted its initial, non-binding bid of $200
million for RASA’s 55% participating interest. 
          Meanwhile, in early 1998, CGC was negotiating with Pet-JA to purchase Pet-JA’s option to buy 5% of CGC’s working interest in the Rio Colorado Block. On
April 23, 1998, Pet-JA and CGC entered into an option purchase agreement granting
CGC the option to purchase Pet-JA’s 5% option for “no less than” $750,000. The
agreement provided that if any other company made an offer for Pet-JA’s option
higher than $850,000, Pet-JA would receive an additional payment from CGC equal
to 60% of the difference between $850,000 and the offer made. 
          On May 29, 1998, Shell CAPSA submitted its final offer for a 55%
participating interest in the Rio Colorado Block. In August 1998, CGC and Reef
substituted CGC’s subsidiary, CGC Internacional Corp. (CGC-IC), a Panamanian
corporation, as the purchaser of the RASA stock. On August 5, 1998, CGC-IC and
Shell CAPSA executed a stock-purchase agreement. On August 14, 1998, CGC-IC
exercised its option to purchase Reef’s shares in RASA. Reef transferred the shares
and was paid the agreed price of $48.5 million. On August 20, 1998, CGC informed
Reef that Shell CAPSA had purchased RASA’s stock from CGC-IC for $186 million. 
On August 24, 1998, CGC-IC and Shell CAPSA completed the transaction.


 
          Reef sued CGC and Shell CAPSA for fraud. Reef contended that CGC had
made misrepresentations to Reef, inducing Reef to sell its stock for less than market
value. Shell CAPSA contended that it was unaware of any fraud and that it purchased
the shares from CGC-IC with the understanding that Reef had approved such a sale. 
In its original petition, Reef alleged that Shell CAPSA had done, and was continuing
to do, business in Texas. Shell CAPSA filed a special appearance, claiming that the
trial court had no personal jurisdiction over it. The trial court denied the special
appearance, and Shell CAPSA timely filed its notice of interlocutory appeal. That
appeal was assigned cause number 01-01-01008-CV.  
          Pet-JA then filed a petition to intervene into the Reef/Shell CAPSA suit, which
petition alleged claims of statutory fraud, common law fraud, aiding and abetting a
breach of fiduciary duty, and conspiracy against Pet-JA. Pet-JA contended that Shell
CAPSA had entered into a conspiracy with CGC whereby CGC had induced Pet-JA
to sell its option at a less-than-favorable price so that Shell CAPSA and CGC could
obtain exclusive control over the working interest in the Rio Colorado Block. In
response, Shell CAPSA filed a special appearance, claiming that the trial court had
no personal jurisdiction over it in relation to Pet-JA’s intervention claims. The trial
court granted the special appearance, and this interlocutory, accelerated appeal
ensued. The trial court issued findings of fact and conclusions of law in support of
its granting of Shell CAPSA’s special appearance and incorporated all of its previous
findings of fact from the first special appearance filed by Shell CAPSA with regard
to Reef’s claims. 
          On August 29, 2002, in appellate cause number 01-01-01008-CV, this Court
reversed the trial court’s denial of Shell CAPSA’s special appearance in the Reef suit,
holding that the trial court had no personal jurisdiction over Shell CAPSA and
rendered a judgment dismissing the case against Shell CAPSA. See Shell Compañia
Argentina de Petroleo, S.A. v. Reef Exploration, Inc., 84 S.W.3d 830 (Tex.
App.—Houston [1st Dist.] 2002, pet. filed). 
Standard of Review and Burden of Proof
          The defendant must negate all possible grounds for personal jurisdiction in
order to prevail on a plea to the jurisdiction. BMC Software Belgium, N.V. v.
Marchand, 83 S.W.3d 789, 793 (Tex. 2002). Existence of personal jurisdiction is a
question of law, but the resolution of underlying factual disputes must sometimes
precede that determination. Preussag Aktiengesellschaft v. Coleman, 16 S.W.3d 110,
113 (Tex. App.—Houston [1st Dist.] 2000, pet. dism’d w.o.j.). 
          If a trial court makes findings of fact and conclusions of law, we may review
the fact findings for legal and factual sufficiency. BMC Software, 83 S.W.3d at 794. 
If there is more than a scintilla of evidence to support the finding, the no-evidence
challenge fails. Id. at 795. We reverse the ruling for factual insufficiency of the
evidence only if the ruling is so against the great weight and preponderance of the
evidence as to be manifestly erroneous or unjust. Minucci v. Sogevalor, S.A., 14
S.W.3d 790, 794 (Tex. App.—Houston [1st Dist.] 2000, no pet.). We review de novo
the trial court’s legal conclusions based on the findings of fact to determine their
correctness. BMC Software, 83 S.W.3d at 794.
                                                Personal Jurisdiction
          A Texas court may assert personal jurisdiction over a non-resident defendant
only if the requirements of both the United States Constitution and the Texas
long-arm statute are satisfied. Helicopteros Nacionales de Colombia, S.A. v. Hall,
466 U.S. 408, 414, 104 S. Ct. 1868, 1872 (1984); CSR, Ltd. v. Link, 925 S.W.2d 591,
594 (Tex. 1996). The Texas long-arm statute allows a Texas court to exercise
personal jurisdiction over a non-resident defendant who does business in Texas. Tex.
Civ. Prac. & Rem. Code Ann. § 17.042 (Vernon 1997). The Texas long-arm statute
reaches as far as the federal and state constitutional guarantees of due process allow.
Garner v. Furmanite Australia Pty., Ltd., 966 S.W.2d 798, 802 (Tex. App.—Houston
[1st Dist.] 1998, pet. denied). Therefore, “the requirements of the Texas long-arm
statute are satisfied if the exercise of personal jurisdiction comports with federal due
process limitations.” CSR, 925 S.W.2d at 594.
          The due process clause permits a state to exert personal jurisdiction over a non-resident defendant only if the defendant has some minimum, purposeful contacts with
the state and the exercise of jurisdiction will not offend traditional notions of fair play
and substantial justice. Dawson-Austin v. Austin, 968 S.W.2d 319, 326 (Tex. 1998). 
A non-resident who has purposely availed himself of the privileges and benefits of
conducting business in Texas has sufficient contacts with the forum to confer
personal jurisdiction over it. CSR, 925 S.W.2d at 594; Garner, 966 S.W.2d at 803. 
However, a defendant should not be subject to the jurisdiction of a Texas court based
upon random, fortuitous, or attenuated contacts. CSR, 925 S.W.2d at 595. A non-resident defendant must have purposely established such minimum contacts with the
forum that it could reasonably anticipate being sued there. Burger King Corp. v.
Rudzewicz, 471 U.S. 462, 475-76, 105 S. Ct. 2174, 2183-84 (1985).
          The “[m]inimum-contacts analysis is further divided into general and specific
personal jurisdiction.” Coleman, 16 S.W.3d at 114. To negate general personal
jurisdiction, a defendant must show its contacts in Texas were not continuous and
systematic. Id. To support a finding of general personal jurisdiction, the defendant’s
forum activities must have been “substantial,” which finding requires stronger
evidence of contacts than for specific personal jurisdiction. Id. 
          The minimum contacts analysis for specific personal jurisdiction focuses on the
relationship between the defendant, the forum, and the litigation. Mem’l Hosp. Sys.
v. Fisher Ins. Agency, Inc., 835 S.W.2d 645, 650 (Tex. App.—Houston [14th Dist.]
1992, no writ). Specific personal jurisdiction is established if the defendant’s alleged
liability arises from, or is related to, an activity conducted within the forum. 
Guardian Royal Exch. Assurance Ltd. v. English China Clays, P.L.C., 815 S.W.2d
223, 227 (Tex. 1991). The defendant’s contacts must have been “purposely directed”
at the forum and must have had a “substantial connection” that resulted in the alleged
injuries. Id. at 226 (citing Burger King, 471 U.S. at 462, 475-76, 105 S. Ct. at 2182,
2183-84) (Stevens, J. concurring); see also Brown v. Gen. Brick Sales Co., Inc., 39
S.W.3d 291, 294 (Tex. App.—Fort Worth 2001, no pet.); Mem’l Hosp. Sys., 835
S.W.2d at 650. “Although not a separate component, foreseeability is an important
consideration in determining whether a non-resident’s ties to a forum create a
substantial connection.” See MTIS Ltd. v. Corporacion Interamericana de
Entretenemiento S.A. de C.V., 64 S.W.3d 62, 67 (Tex. App.—Houston [14th Dist.]
2001, no pet.) (citing C-Loc Retention Sys., Inc. v. Hendrix, 993 S.W.2d 473, 477-78
(Tex. App.—Houston [14th Dist.] 1999, no pet.). Merely contracting with a Texas
corporation does not satisfy the minimum contacts requirement. TeleVentures, Inc.
v. Int’l Game Tech., 12 S.W.3d 900, 910 (Tex. App.—Austin 2000, pet. denied). 
Prior negotiations, contemplated future consequences, the terms of a contract, and the
parties’ course of dealing must be considered in determining whether the defendant
purposely established minimum contacts within the forum. Id. 
Special Appearance and Separate Jurisdictional Analysis
          In its first through ninth issues, Pet-JA contends that the trial court erred by
conducting a separate jurisdictional analysis before granting Shell CAPSA’s special
appearance as to Pet-JA’s intervention claims. 
A.      Are Pet-JA’s Claims Severable?
          Pet-JA first argues that the trial court erred by conducting a separate
jurisdictional analysis before granting Shell CAPSA’s special appearance because it
claims there is no “legal authority authorizing or supporting the trial court’s separate
jurisdiction evaluation over Shell CAPSA in connection with Reef’s claims.”
          Although Pet-JA does not mention this rule, we note that the Rules of Civil
Procedure allow a party may make a special appearance as to an entire proceeding or
as to any severable claim. See Tex. R. Civ. P. 120a(1). Shell CAPSA filed a separate
special appearance as to Pet-JA’s intervention claims against Shell CAPSA. 
Therefore, before the trial court could grant Shell CAPSA’s special appearance with
regard to Pet-JA’s claims, it implicitly had to conclude that those claims were
severable. A claim is severable if (1) the controversy involves more than one cause
of action, (2) the severed claim is one that would be the proper subject of the lawsuit
if independently asserted, and (3) the severed claim is not so interwoven with the
remaining action that it involved the same facts and issues. Guar. Fed. Sav. Bank v.
Horseshoe Operating Co., 793 S.W.2d 652, 658 (Tex. 1990). We review the trial
court’s implied finding on severability for abuse of discretion. See id.
          The initial lawsuit involved Reef’s claims against Shell CAPSA relating to the
stock-purchase transaction and Reef/RASA’s sale of their 55% participating interest
in the Rio Colorado Block to CGC. Pet-JA intervened, asserting claims against Shell
CAPSA of statutory fraud, common law fraud, aiding and abetting a breach of
fiduciary duty, and conspiracy and arguing that Shell CAPSA had entered into a
conspiracy with CGC to obtain exclusive control of the participating interest in the
Rio Colorado Block. Pet-JA claims that it would not have sold its 5% option had it
known of Shell CAPSA’s March 23, 1998 non-binding offer. 
          Pet-JA’s claims were severable. First, Pet-JA and Reef asserted one or more 
claims separate and distinct from each other. Second, Pet-JA’s claims were the
proper subject of an independently asserted lawsuit because its claims were capable
of being brought as a separate suit with a separate final judgment. See Martinez v.
Humble Sand & Gravel, Inc., 875 S.W.2d 311, 312 (Tex. 1994), aff’d sub nom, 974
S.W.2d 31 (Tex. 1998). Third, although Pet-JA’s claims against Shell CAPSA
involved many of the same parties and the same hydrocarbon concession as were
involved in the rest of the suit, Pet-JA’s claims were not so interwoven with Reef’s
claims that they involved the same facts and issues. Reef’s suit alleged liability
arising out of an option agreement between Reef and CGC under which CGC
purchased Reef/RASA’s 55% working interest and later transferred this interest to
Shell CAPSA. Pet-JA’s intervention involved claims relating to a separate option
agreement between CGC and Pet-JA, under which agreement CGC purchased Pet-JA’s option to buy 5% of CGC’s 45% working interest. This 5% interest was not
later transferred to Shell CAPSA, but was retained by CGC. Both option agreements
were executed and exercised on different dates and involved separate and distinct
facts, benefits, duties, and liabilities.


 See In re Hoover, Bax & Slovacek, L.L.P., 6
S.W.3d 646, 652 (Tex. App.—El Paso 1999, no pet.) (holding contract claims
severable when separate, unrelated, and not controlled by same facts and issues);
Nicor Exploration Co. v. Florida Gas Transmission Co., 911 S.W.2d 479, 482 (Tex.
App.—Corpus Christi 1995, writ denied) (finding contract claims not severable when
they are identical and involve same facts and issues). Therefore, we cannot say that
the trial court abused its discretion by implicitly concluding as part of its rule 120a(1)
analysis that Pet-JA’s claims were severable.


 
B.      Was the Trial Court Required to Follow Federal Law?
          Pet-JA also argues that the trial court should have looked to the federal courts
for analogous guidance on whether to conduct a separate jurisdictional evaluation as
to Pet-JA’s intervention. Pet-JA argues that, because federal law does not permit the
trial court to separate the plaintiff’s and the intervenor’s claims against the same
defendant in determining personal jurisdiction over the defendant, the trial court
should not have conducted a separate jurisdictional evaluation. See 28 U.S.C. § 1367
(2002) (stating that supplemental jurisdiction does not permit a separate jurisdictional
evaluation of an intervention); IUE AFL-CIO Pension Fund v. Hermann, 9 F.3d 1049,
1056 (2nd Cir. 1993) (holding that pendent jurisdiction does not require a separate
jurisdictional evaluation of an intervention). 
          Pet-JA, however, has offered no authority to support its argument that the trial
court is bound by federal standards, particularly because there are no jurisdictional
equivalents in Texas that correspond to the federal doctrines of supplemental and
pendent jurisdiction upon which the relied-upon federal rule rests. We hold that the
trial court did not err by conducting a separate jurisdictional analysis with regard to
Pet-JA’s intervention claims before granting Shell CAPSA’s special appearance.


 
          We overrule Pet-JA’s first through ninth issues. 
Special Appearance and Factual SufficiencyIn its tenth through twelfth issues, Pet-JA contends that the trial court erred by
finding that it did not have jurisdiction over Pet-JA’s intervention claims against
Shell CAPSA.


 Pet-JA argues that there is factually insufficient evidence to support
the trial court’s fact findings and legal conclusion that Shell CAPSA’s purchase of
Reef’s 55% interest in the Rio Colorado Block was a transaction separate and distinct
from the transaction in which CGC purchased Pet-JA’s option to buy 5% of CGC’s
working interest in the Rio Colorado Block. Pet-JA also claims that the trial court’s
fact findings one through eight establish that Shell CAPSA’s contacts with Texas
relating to its purchase of Reef’s 55% interest were part of a larger conspiracy by
Shell CAPSA to obtain exclusive ownership of the working interest in the Rio
Colorado Block. For this reason, Pet-JA argues that the trial court had both specific
and general personal jurisdiction over Shell CAPSA as to Pet-JA’s intervention
claims. 
A.      Specific Personal Jurisdiction 
          To support its argument that the trial court had specific personal jurisdiction
over Shell CAPSA, Pet-JA relied on (1) the February 28, 1995 Participation
Agreement and the October 22, 1996 Amendment and Clarification of the
Participation Agreement, both of which included a Texas choice-of-law provision;
(2) the August 18, 1998 CGC/Shell CAPSA stock-purchase agreement and due
diligence relating to that transaction; and (3) CGC and Shell CAPSA’s alleged
conspiracy to obtain exclusive ownership of the participating interest in the Rio
Colorado Block.
 
 
          1.       Participation Agreement and Amendment to the Participation
Agreement

          Pet-JA first argues that specific personal jurisdiction was supported by the
February 28, 1995 Participation Agreement between Pet-JA and Reef and the October
22, 1996 Amendment and Clarification of Participation Agreement, which gave CGC
a 45% participating interest in the Rio Colorado Block, and both of which included
a Texas choice-of-law provision. Pet-JA argues that because Shell CAPSA was the
assignee, or successor-in-interest, of these agreements, these agreements subject Shell
CAPSA to personal jurisdiction in Texas. However, this agreement is not related to
Pet-JA’s sale of its 5% option, which is the basis of Pet-JA’s intervention claims
against Shell CAPSA. Further, Shell CAPSA’s status as assignee of these agreements
is not sufficient to establish specific personal jurisdiction as to Pet-JA’s intervention
claims. See Old Kent Leasing Serv. Corp. v. McEwan, 38 S.W.3d 220, 230 (Tex.
App.—Houston [14th Dist.] 2001, no pet.) (holding that lease assignee’s contacts
with plaintiff were insufficient to subject assignee to personal jurisdiction because
assignee was not Texas resident and nothing in lease required assignee to provide any
Texas-based goods or services). Therefore, Pet-JA could not rely on either of these
agreements to support specific personal jurisdiction. 
 
 
          2.       CGC/Shell CAPSA Stock-Purchase Agreement and Related Due
Diligence 

          Pet-JA next argues that specific personal jurisdiction was supported by the
August 18, 1998 CGC/Shell CAPSA stock-purchase agreement, which involved the
sale of CGC’s 55% participating interest to Shell CAPSA, and the due diligence
relating to this agreement.


 However, like the participation agreement and
amendment to the participation agreement, this transaction was not related to Pet-JA’s
sale of its 5% option, which was the basis of its intervention. Therefore, Pet-JA could
not rely on the stock-purchase agreement or related due diligence to support specific
personal jurisdiction.
          3.       Alleged Conspiracy Between CGC and Shell CAPSA
          Finally, Pet-JA argues that specific personal jurisdiction was supported by an
alleged conspiracy between CGC and Shell CAPSA to obtain exclusive ownership
of the participating interest in the Rio Colorado Block. Pet-JA claims that CGC and
Shell CAPSA entered into a scheme called “Project Gold,” in which CGC and Shell
CAPSA conspired together to obtain exclusive ownership of the participating interest
in the Rio Colorado Block. 
          Texas courts have declined to recognize the assertion of personal jurisdiction
over a non-resident defendant based solely upon the effects or consequences of an
alleged conspiracy with a resident in the forum state. Nat’l Indus. Sand Assoc. v.
Gibson, 897 S.W.2d 769, 773 (Tex. 1995); see Schroeder v. Valdez, 941 S.W.2d 312,
314-15 (Tex. App.—Corpus Christi 1997, no writ). The acts of an alleged
conspirator cannot be imputed to its co-conspirator so as to render the co-conspirator
amenable to suit in Texas. Id. Instead, we must restrict our inquiry to whether Shell
CAPSA itself purposefully established minimum contacts such as would satisfy due
process. See Gibson, 897 S.W.2d at 773. 
          To establish specific personal jurisdiction, Pet-JA relied on a letter from CGC
to Shell CAPSA dated May 7, 1998, discussing CGC’s purchase of Reef’s
participating interest in the Rio Colorado Block. In this letter, Mark Patterson,
CGC’s Chief Executive Officer, wrote, “Assuming that CGC and Shell go forward
with the above described joint venture, we consider the optimal configuration of the
Rio Colorado consortium to be one of CGC and Shell, exclusively.” (Emphasis
added.) Further, Pet-JA relied on documents obtained from CGC’s investment
advisors, Violy, Byorum & Parters Holding, L.L.C. (Violy), allegedly showing that
Violy conceived of a plan dubbed “Project Gold” on behalf of CGC and Shell to
facilitate CGC and Shell CAPSA’s obtaining exclusive ownership of the participating
interest in the Rio Colorado Block. 
          However, none of these communications was made by Shell CAPSA or its
agents. Pet-JA did not produce evidence of any action committed in or purposely
directed at Texas by Shell CAPSA—as opposed to Shell—in furtherance of an
alleged conspiracy with CGC to obtain exclusive control over the participating
interest in the Rio Colorado Block. Further, Pet-JA admitted that Shell CAPSA and
its agents had made no misrepresentations to Pet-JA in Texas. 
          Therefore, we hold that the trial court did not err by concluding that Shell
CAPSA did not have sufficient contacts with Texas to establish specific personal
jurisdiction as to Pet-JA’s intervention claims. 
B.      General Personal Jurisdiction
          To support its argument that the trial court had general personal jurisdiction
over Shell CAPSA with regard to Pet-JA’s intervention claims, Pet-JA argues that
Shell CAPSA’s contacts with Texas were continuous and systematic because (1)
Shell CAPSA had purchased certain goods and services in Texas, including
petrochemical and other industrial products, as well as stevedoring and shipping
services and (2) Shell CAPSA had retained and paid for legal services of Texas law
firms for matters unrelated to the defense of this lawsuit. 
          “[M]ere purchases, even if occurring at regular intervals, are not enough to
warrant a [s]tate’s assertion of in personam jurisdiction over a non-resident
corporation in a cause of action not related to those purchase transactions.” Hall, 466
U.S. at 418, 104 S.Ct. at 1874; Am. Type Culture Collection, Inc. v. Coleman, 83
S.W.3d 801, 808 (Tex. 2002) (quoting Hall, 466 U.S. at 418, 104 S.Ct. At 1874). 
Therefore, Pet-JA could not rely on Shell CAPSA’s purchases in Texas as the basis
of general personal jurisdiction because these purchases were not related to this
lawsuit. Further, Shell CAPSA’s retention of Texas law firms for matters unrelated
to the defense of this lawsuit did not amount to substantial or systematic and
continuous contact with Texas. See Preussag, 16 S.W.3d at 126 (concluding that
defendant’s retention of Houston law firm did not establish general personal
jurisdiction in Texas). Therefore, we hold that the trial court did not err in concluding
that Shell CAPSA did not have a substantial connection with Texas so as to establish
general personal jurisdiction. 
          We hold that the trial court’s fact findings and legal conclusions that it ad no
personal jurisdiction over Shell CAPSA was not so against the great weight and
preponderance of the evidence as to be manifestly erroneous or unjust.
          We overrule Pet-JA’s tenth through twelfth issues.


Conclusion
          We affirm the trial court’s order granting Shell CAPSA’s plea to the
jurisdiction.



 /s/ Tim Taft
     Justice
 
Panel consists of Justices Taft, Nuchia, and Higley.