Opinion issued July 28, 2005



 











In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-04-00542-CV
____________
 
TRIGEANT HOLDINGS, LTD. AND TRIGEANT HOLDINGS, LLC,
Appellants
 
V.
 
JERRAL W. JONES, Appellee
 

 
 
On Appeal from the 113th District Court
Harris County, Texas
Trial Court Cause No. 1999-01743
 

 
 
O P I N I O N
          This is an accelerated, interlocutory appeal from the trial court’s denial of a
special appearance filed by appellants, Trigeant Holdings, Ltd. and Trigeant
Holdings, LLC (collectively “the Trigeant Holdings entities”). See Tex. Civ. Prac.
& Rem. Code Ann. § 51.014(a)(7) (Vernon Supp. 2004-2005). The Trigeant
Holdings entities argue that the trial court erred by denying their special appearance
for the following reasons: (1) the trial court lacked specific jurisdiction over the
Trigeant Holdings entities because none of the appellee’s, Jerral W. Jones’s, causes
of action arose out of activities that the Trigeant Holdings entities purposefully
directed toward Texas; (2) the trial court lacked general personal jurisdiction over the
Trigeant Holdings entities which had no continuous and systematic contacts with
Texas;


 and (3) the exercise of personal jurisdiction over the Trigeant Holdings
entities would not comport with fair play and substantial justice. We affirm the trial
court’s denial of the Trigeant Holdings entities’ special appearance.
Background
          In 1982, Jerral W. Jones and Sanford Brass, both Texas residents, jointly
executed a secured promissory note for $15,200,000. The funds were invested in
Sentry Refining, Inc., a refinery jointly owned by Jones and Brass. Jones and Brass
eventually defaulted on the note, prompting the Federal Deposit Insurance
Corporation (“FDIC”) to bring suit against Jones and Brass to collect the balance
owed. 
          Jones agreed to settle the case by personally paying $13,700,000 to the FDIC. 
As part of the settlement, Jones divested himself of all ownership interest in Sentry
Refining, Inc. and transferred full ownership to Brass. In return, Brass executed three
promissory notes to Jones intended to secure repayment of the $13,700,000
personally expended by Jones. 
           In 1987, Jones and Brass entered into an amended settlement agreement
pertaining to the debt Brass owed Jones. The amended agreement provided that
payment on two of the notes, in the combined principal amount of $6,525,000, would
be “non-recourse” to Brass, that is, Brass would not be personally liable on the notes. 
The amended agreement further provided that the payment on the two notes was to
come from profits, distributions, or liquidation proceeds derived from Brass’s interest
in a refinery located in Corpus Christi, Texas.


 The Corpus Christi refinery was
controlled by Trifinery Joint Venture (“TJV”), a Texas company in which Brass
owned a 50% interest and into which Brass had transferred the assets of Sentry
Refining, Inc.
          Over the course of years, Brass represented to Jones that TJV was unprofitable. 
Brass claimed that TJV was unable to make any distributions to its shareholders, and
Brass, therefore, could not make any payments to Jones. As a result, Brass did not
make any payments on the notes. In 1994, TJV transferred all of its interest in the
Corpus Christi refinery to Trifinery Petroleum Services (“TPS”), another Texas
company in which Brass also owned a 50% interest. Brass later bought the other one-half-interest, giving him 100 % ownership of the Trifinery assets.
          In 1999, Jones brought a declaratory judgment action against Brass in an
attempt “to enforce the terms, obligations and conditions” in the settlement agreement
addressing Brass’s repayment to Jones. Jones further alleged breach of contract and
breach of implied covenant of good faith and fair dealing. 
          On June 29, 2001, while Jones’s suit against Brass was pending, TPS sold its
interest in the Corpus Christi refinery for $17,663,665 to Trigeant, Ltd., a Florida
company in which Brass’s son, Arthur Brass, owned a 48.51% interest. Jones alleged
that, at the time of Trigeant, Ltd.’s purchase of the Corpus Christi refinery, the fair
market value of the refinery was $38,000,000 to $44,000,000—more than twice the
amount of the sale. 
          On the same day as the sale of the Corpus Christi refinery to Trigeant, Ltd., the
Trigeant Holdings entities executed a Capitalization Agreement to purchase a 100%
equitable ownership of Trigeant, Ltd. Pursuant to this agreement, the Trigeant
Holdings entities acquired a 100% equitable ownership interest in all of Trigeant,
Ltd.’s assets, including the refinery. The Capitalization Agreement provides in
pertinent part: 
This Agreement . . . is entered into as of June 29, 2001, by and among
Trigeant Holdings, LLC, a Florida limited liability company (the
“General Partner”), Trigeant Holdings, Ltd., a Florida limited
partnership (the “Buyer”), Harry Sargeant, II., Harry Sargeant, III,
Daniel Sargeant, James Sargeant, and Arthur J. Brass, (the “Sellers”)
          . . . 
ARTICLE I
DEFINITIONS
          . . . 
“Equity Interests” shall mean the total of . . . (b) all of the issued
and outstanding membership interests in Trigeant, LLC . . ., and (c) all
of the issued and outstanding limited partnership interests of Trigeant,
Ltd., . . . 

ARTICLE II
PURCHASE AND SALE OF ASSETS; CLOSING 
 
2.1Purchase and Sale of Sellers’ Assets. Subject to the terms and
conditions of this Agreement, the Buyer agrees to purchase from Sellers,
and Sellers and the General Partner agree to sell, transfer, convey, and 
          deliver to the Buyer at the Closing the Equity Interests.

Additionally, under this agreement, Arthur Brass exchanged his 48.51% interest in
Trigeant, Ltd. for a 25% equity interest in the Trigeant Holdings entities and received
a cash distribution from the Trigeant Holdings entities in an amount exceeding
$1,000,000. 
          Jones joined the Trigeant Holdings entities, Arthur Brass, Trigeant, Ltd., TJV,
and TPS to the suit pending against Sanford Brass. In addition to the causes of action
already asserted against Sanford Brass, Jones sued the entities under the Texas
Uniform Fraudulent Transfers Act (“UFTA”) for fraudulently transferring the refinery
assets and its proceeds to various entities to avoid paying any of the proceeds to
Jones. Jones also sued these entities for civil conspiracy alleging that they conspired
to design and implement this scheme to fraudulently transfer the refinery assets and
its proceeds to prevent Jones from receiving them.


 Sanford Brass, Arthur Brass,
Trigeant, Ltd., TJV, and TPS filed answers; however, the Trigeant Holdings entities
filed a special appearance and answered subject to their special appearance.
          The Trigeant Holdings entities’ special appearance asserted that the trial court
did not have jurisdiction over them for the following reasons: (1) the Trigeant
Holdings entities were formed and continued to exist under the laws of Florida and
were not residents of Texas, no formal meetings took place in Texas, and the Trigeant
Holdings entities did not conduct business in Texas; (2) the sale of the Trifinery
assets was not made for the Trigeant Holdings entities’ benefit and the Trigeant
Holdings entities did not engage in any specific acts within Texas in connection with
the asset sale; and (3) Jones’s allegations were insufficient to confer jurisdiction. 
Additionally, the Trigeant Holdings entities attached evidence in the form of an
affidavit from Robert J. Stefans, Jr., Vice President of Trigeant Holdings, LLC. In
his affidavit, Stefans testified to the following:
          - Trigeant Holdings, LLC is a Florida limited liability company;
          - Trigeant Holdings, Ltd. is a Florida limited partnership;- the Trigeant Holdings entities were formed and continue to exist under the
laws of the State of Florida;

- Trigeant Holdings, Ltd. is the holding company for various entities including
Trigeant, Ltd.;

          - Trigeant Holdings, LLC is the general partner of Trigeant Holdings, Ltd.;

- neither Trigeant Holdings entity has ever been served with a lawsuit in Texas
other than this suit;

          - neither Trigeant Holdings entity maintains a place of business in Texas;

          - neither Trigeant Holdings entity maintains any agents or employees in Texas;

- neither Trigeant Holdings entity owns any entity formed under Texas law,
although Trigeant Holdings, LLC has ownership interests in some
entities which do business in Texas, including Trigeant, Ltd.;

          - the registered agent for the Trigeant Holdings entities is in Miami, Florida;

- all formal meetings for the Trigeant Holdings entities are conducted in
Florida;

- neither Trigeant Holdings entity conducts any business, owns property, or has
any bank accounts in Texas;

          - the sole office for the Trigeant Holdings entities is in Boca Raton, Florida;

- neither Trigeant Holdings entity has engaged in any business with Jones or
Sanford Brass; and

- neither Trigeant Holdings entity has ever received a conveyance of any assets
from TPS or of any assets formerly belonging to TPS.

          In his response to the Trigeant Holdings entities’ special appearance, Jones
alleged that, 
during the course of this litigation, Brass’ [sic] took his scheme to
deprive Jones of any payment under the settlement agreement to a new
level. In 2001, he conspired with his son, Arthur J. Brass, and others to
sell the refinery business without paying any sale proceeds to Jones. 
The conspirators designed a fraudulent scheme to prevent Brass’s
receipt of net sale proceeds, which necessarily would have been applied
to the payment of [the two notes].

Accordingly, Jones argued that the trial court had specific jurisdiction over the
Trigeant Holdings entities and attached the following evidence in support of his
allegations that the proceeds of the refinery were being fraudulently transferred to
various entities and Arthur Brass:
- two independent appraisals from 2000 and 2001, showing that the fair market
value of the Trifinery business was between $28,000,000 and
$45,600,000;

- the Asset Purchase Agreement executed in 2001 between TPS and Trigeant,
Ltd., showing that the Trifinery assets were sold for $17,663,665 and
that the agreement was executed in Houston, Texas;

- the Trigeant, Ltd., Limited Partnership Agreement, showing that Arthur Brass
owned 48.51% and Trigeant Holdings, LLC owned 1% of Trigeant, Ltd.
at the time of Trigeant, Ltd.’s purchase of the Trifinery assets;
- the Employment Agreement between Trigeant, Ltd. and Arthur Brass
reflecting that Arthur Brass was to be paid $400,000 a year to serve as
director of business development for Trigeant, Ltd.; 

- a promissory note indicating that Arthur Brass owed Harry Sargeant, III (his
partner in Trigeant, Ltd. and manager of Trigeant Holdings, LLC)
$490,000;


 

- a Consulting Agreement indicating that Sanford Brass was paid $20,833.33
a month and the use of a driver and car to consult with Trigeant, Ltd.; 

- the Capitalization Agreement of Trigeant Holdings, Ltd. executed in
Houston, Texas in 2001 reflecting Arthur Brass’s transfer of his equity
interest in Trigeant, Ltd. in exchange for a 25% membership interest in
Trigeant Holdings, Ltd. 

          - the Capitalization Agreement was executed in Houston, Texas; and 

- excerpts from Arthur Brass’s deposition during which he testified about the
income he received for his partnership interest in the Trigeant Holdings
entities.

Jones alleged that all proceeds from the transfer of assets to the Trigeant Holdings
entities and those proceeds paid to Arthur Brass should have been applied to repay
the settlement notes owed to him. Jones did not allege general jurisdiction, did not
rely on an alter ego theory, and did not assert the parent-subsidiary relationship as a
basis for jurisdiction. 
          The trial court denied the Trigeant Holdings entities’ special appearance. 
Special Appearance
Standard of Review
          The plaintiff bears the initial burden of pleading sufficient allegations to bring
a non-resident defendant within the personal jurisdiction of a Texas court. BMC
Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 793 (Tex. 2002). However,
upon filing a special appearance, the non-resident defendant assumes the burden to
negate all the bases of personal jurisdiction alleged by the plaintiff. Id. The existence
of personal jurisdiction is a question of law, reviewed de novo, but that determination
must sometimes be preceded by the resolution of underlying factual disputes. 
Preussag Aktiengesellschaft v. Coleman, 16 S.W.3d 110, 113 (Tex. App.—Houston
[1st Dist.] 2000, pet. dism’d w.o.j.). Although findings of fact are not required, when,
as here, the trial court does not file findings of fact in a special appearance, all
questions of fact are presumed to support the judgment. See Tex. R. App. P. 28.1; Ace
Ins. Co. v. Zurich Am. Ins. Co., 59 S.W.3d 424, 427 (Tex. App.—Houston [1st Dist.]
2001, pet. denied). 
Personal Jurisdiction and Due Process Requirements
          Texas courts may assert personal jurisdiction over a non-resident defendant
only if the Texas long-arm statute authorizes jurisdiction and the exercise of
jurisdiction is consistent with federal and state due process standards. Guardian
Royal Exch. Assur., Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex.
1991). The Texas long-arm statute reaches “as far as the federal constitutional
requirements of due process will allow.” Id. Thus, the Texas long-arm statute
requirements are satisfied if exercising jurisdiction comports with federal due process
limitations. Id. We rely on precedent from the United States Supreme Court as well
as our own state’s supreme court decisions in determining whether a non-resident
defendant has met its burden to negate all bases of jurisdiction. BMC Software, 83
S.W.3d at 795. 
Under the Due Process Clause of the Fourteenth Amendment, jurisdiction is
proper if a non-resident defendant established “minimum contacts” with Texas and
maintenance of the suit does not offend “traditional notions of fair play and
substantial justice.” Int’l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154,
158 (1945). Accordingly, we focus upon the defendant’s activities and expectations
in deciding whether it is proper to call it before a Texas court. Id.
     The minimum-contacts analysis requires that a defendant “purposefully avail”
itself of the privilege of conducting activities within Texas, thus invoking the benefits
and protections of our laws. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105
S. Ct. 2174, 2183 (1985). The defendant’s activities, whether they consist of direct
acts within Texas or conduct outside Texas, must justify a conclusion that the
defendant could reasonably anticipate being called into a Texas court. World-Wide
Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 567 (1980). A
defendant must seek some benefit, advantage, or profit by “availing” itself of the
jurisdiction. Jurisdiction is premised on notions of implied consent that, by invoking
the benefits and protections of a forum’s laws, a non-resident consents to suit there.
Michiana Easy Livin’ Country, Inc. v. Holten, , 48 Tex. Sup. Ct. J. 789, 2005 WL
1252268 at *3, (Tex. May 27, 2005).
A defendant is not subject to jurisdiction here if its Texas contacts are random,
fortuitous, or attenuated. See id.; Guardian, 815 S.W.2d at 226. Nor can a defendant
be haled into a Texas court based on the unilateral acts of a third party. Michiana,
2005 WL 1252268 at *3. It is the quality and nature of the defendant’s contacts,
rather than their number, that is important to the minimum-contacts analysis. 
Guardian, 815 S.W.2d at 230 n.11.
Specific Jurisdiction
          A defendant’s contacts with a forum can give rise to either general or specific
jurisdiction. CSR Ltd. v. Link, 925 S.W.2d 591, 595 (Tex. 1996). Specific
jurisdiction is established if the defendant’s alleged liability arises from or is related
to an activity conducted within the forum. Id. When specific jurisdiction is asserted,
the minimum contacts analysis focuses on the relationship between the defendant, the
forum, and the litigation. Blair Communications, Inc. v. SES Survey Equip. Serv.,
Inc., 80 S.W.3d 723, 727 (Tex. App.—Houston [1st Dist.] 2002, no pet.); Mem’l
Hosp. Sys. v. Fisher Ins. Agency, Inc., 835 S.W.2d 645, 650 (Tex. App.—Houston
[14th Dist.] 1992, no writ). The contacts must be purposely directed at or take place
within the forum and must have a “substantial connection” that results in the alleged
injuries. Mem’l Hosp. Sys., 835 S.W.2d at 650. Merely contracting with a Texas
citizen does not, by itself, satisfy the minimum contacts requirement. Id. Rather, the
focus of the examination must be the nature of the contacts and the “nexus” these
contacts create with the forum state. McDermott v. Cronin, 31 S.W.3d 617, 621–22
(Tex. App.—Houston [1st Dist.] 2000, no pet.).
Application of the Texas Long–Arm Statute
          The Trigeant Holdings entities initially argue that the trial court lacks specific
jurisdiction over them because they did not commit any tort in whole or in part in
Texas as required for personal jurisdiction by the Texas Long-Arm Statute.


 They
argue that, as a matter of law, they cannot be held liable for any alleged violation of
the UFTA because (1) they are not “transferees” under the statute and (2) the statute
does not give Jones any remedy against them. We disagree. 
Commission of Tort—Violation of UFTAThe Trigeant Holdings entities are transferees and subject to liability under the
UFTA. The UFTA not only creates liability against “the person for whose benefit the
transfer was made,” such as the debtor, but also against “the first transferee of the
asset,” or any “subsequent transferee.” See Tex. Bus. & Com. Code Ann. §
24.009(b) (Vernon 2002);


 see also Amoco Chem. Co. v. Tex Tin Corp., 925 F. Supp.
1192, 1200–01 (S.D. Tex. 1996). The UFTA does not define who is a “transferee”
under the statute. It does, however, specifically define the term “transfer.” Under the
UFTA, “transfer” means “every mode, direct or indirect, absolute or conditional,
voluntary or involuntary, of disposing of or parting with an asset or an interest in an
asset, and includes payment of money, release, lease, and creation of a lien or other
encumbrance.” Tex. Bus. & Com. Code Ann. § 24.002(12) (Vernon 2002) (emphasis
added). Under this broad definition of “transfer,” the purchase by and transfer to the
Trigeant Holdings entities of an equitable interest in the Corpus Christi refinery—the
very subject of Jones’s causes of action—renders the Trigeant Holdings entities
“transferees” under the UFTA. See, e.g., Tel. Equip. Network v. TA/Westchase Place
Ltd., 80 S.W.3d 601, 611 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (holding that
party became a “transferee” under UFTA once it acquired a lien against asset alleged
to have been fraudulently transferred.) 
 Likewise, Jones has a potential remedy against the Trigeant Holdings entities.
The expansive language of the UFTA’s “remedy” section provides Jones with a broad
range of remedies that can be sought from subsequent transferees, such as the
Trigeant Holdings entities, if they are found to have participated in the fraudulent
transfer of assets. Section 24.008, entitled “Remedies of Creditors,” provides as
follows: 
(a)     In an action for relief against a transfer or obligation under this chapter,
a creditor, subject to the limitations in Section 24.009 of this code, may
obtain:
 
(1)avoidance of the transfer or obligation to the extent
necessary to satisfy the creditor’s claim;
 
(2)an attachment or other provisional remedy against
the asset transferred or other property of the
transferee in accordance with the applicable Texas
Rules of Civil Procedure and the Civil Practice and
Remedies Code relating to ancillary proceedings; or
 
(3)subject to applicable principles of equity and in
accordance with applicable rules of civil procedure:
 
(A)an injunction against further disposition by
the debtor or a transferee, or both, of the asset
transferred or of other property;
 
(B)appointment of a receiver to take charge of
the asset transferred or of other property of
the transferee; or 
 
(C)any other relief the circumstances may
require.
 
Tex. Bus. & Com. Code Ann. § 24.008(a) (Vernon 2002) (emphasis added). See,
e.g., Airflow Houston Inc. v. Theriot, 849 S.W.2d 928, 934 (Tex. App.—Houston [1st
Dist.] 1993, no writ) (interpreting UFTA’s broad equitable remedy language, by
holding that judgment against transferee for entire amount of debt owed to defrauded
creditor was permitted under equitable relief provisions of UFTA, regardless of
whether entire value of asset or interest in asset was ever received by transferee);
Guiterrez v. Givens, 1 F. Supp. 2d 1077, 1087 (S.D. Cal. 1998) (interpreting the
UFTA’s broad equitable remedy language to mean that, when sufficient allegations
exist regarding an entity’s complicity with a debtor to fraudulently transfer assets, it
was possible for debtor to make a claim for relief against entity). Accordingly, it is
possible for Jones to obtain a remedy against the Trigeant Holdings entities under the
UFTA if it is found, as alleged by Jones, that they received fraudulently transferred
assets in bad faith and in complicity with Sanford Brass. 


 
Minimum Contacts 
          Next, the Trigeant Holdings entities argue that they do not have sufficient 
minimum contacts with Texas for the trial court to exercise specific jurisdiction over
them. We disagree. 
          The Trigeant Holdings entities’ acquisition of an ownership interest in a
refinery in Corpus Christi, Texas is the contact at issue. The crux of Jones’s claims
against the Trigeant Holdings entities for violation of the UFTA and civil conspiracy
is that the Trigeant Holdings entities purchased and received a 100% equitable
ownership of Trigeant, Ltd., and, thus, equitable ownership of the very assets at issue
in this case— the Corpus Christi refinery and any proceeds from this refinery. Jones
alleges that this transaction occurred so that Sanford Brass and Trigeant, Ltd. could
avoid paying any future refinery proceeds to Jones, a Texas resident. Jones further
alleges that the Trigeant Holdings entities purchased and received this interest with
specific knowledge that there was a lawsuit pending in Texas regarding the proceeds
from the Corpus Christi refinery. 
          By acquiring an equitable ownership interest in the Corpus Christi refinery at
issue in this lawsuit, the Trigeant Holdings entities purposefully availed themselves
of the benefits and privileges of conducting activities in Texas. This contact with
Texas was not the result of a unilateral act of a third party nor was it random or
fortuitous; it was the direct and intended consequence of the Trigeant Holdings
entities’ execution of the Capitalization Agreement. As a result of this contact, the
Trigeant Holdings entities became the beneficiaries of any future income streams
generated by the refinery in Texas. Furthermore, this contact is the focus of the
injuries Jones alleges that he suffered as a result of the Trigeant Holdings entities’
conduct. Because this contact was made during and with knowledge of the litigation
in Texas concerning the proceeds of this very refinery, the Trigeant Holdings entities
could expect to be haled into a Texas court regarding this contact. Under these
circumstances, it would not offend the notions of fair play and substantial justice for
the trial court to exercise specific jurisdiction over the Trigeant Holdings entities and
require them to defend this action in Texas. 
Conclusion
          We affirm the order of the trial court.

                                                                        George C. Hanks, Jr.
                                                                        Justice

Panel consists of Justices Nuchia, Hanks, and Higley.