Opinion issued December 8, 2005 



















In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-04-01213-CV
__________
 
THE PAUL GILLRIE INSTITUTE, INC., PAUL GILLRIE, AND JOHN
DARMENTO, Appellants
 
V.
 
UNIVERSAL COMPUTER CONSULTING, LTD. AND DEALER
COMPUTER SERVICES, INC., Appellees
 

 
 
On Appeal from the 113th District Court
Harris County, Texas
Trial Court Cause No. 2004-50577
 

 
 
O P I N I O N
          In this libel suit, appellants, the Paul Gillrie Institute, Inc. (“PGI”), Paul Gillrie,
and John Darmento bring this accelerated interlocutory appeal challenging the trial
court’s order denying their special appearance.


 In their sole issue, appellants
contend that the trial court erred in determining that they were subject to the personal
jurisdiction of a Texas court. We affirm. 
Factual and Procedural Background
          Appellees, Universal Computer Consulting, Ltd. and Dealer Computer
Services, Inc. (collectively, “UCS”), are affiliated companies that provide computer
systems to automobile dealerships across the United States. PGI is described as
“North America’s leading consultant and advocate for automobile dealers in their
quest to reduce technology expense in their dealerships.” Gillrie is the founder of
PGI, and both Gillrie and Darmento are directors and employees of PGI. PGI serves
a “diverse client base of dealers, CPA firms and attorneys throughout the United
States and Canada,” and publishes a trade publication titled “the Journal of
Dealership Computing,” six times a year. In its June 2004 journal, which was edited
by Darmento, PGI published an article revealing the results of a survey comparing
vendors of car-dealership computer systems. The article stated that although “UCS
received the highest ratings as each one of their products was scored,” UCS received
the lowest scores when customers were asked “to rate the company as a whole.” The
article characterized the results of the survey to indicate that customers liked UCS’s
products but did not like the company. The journal also contained a headline that
stated, in bold, “Survey Shows UCS Clients Want to Leave.” Under this headline, the
article asserted that 71% of UCS’s customers, if they had the choice, would not sign
up with UCS again, and that, as a whole, more UCS customers were dissatisfied with
their computer vendor than customers of any other vendor. Finally, the journal
contained several graphs illustrating that UCS received the highest marks in
numerous categories, but received the lowest “overall rating” among the rated
computer vendors. 
          Robert Nalley, president of UCS, testified that, in the summer of 2004, he was
contacted by Dan Chernault, vice president and chief financial officer of Russell
Smith Ford (“Russell Smith”), a UCS customer located in Harris County, Texas. 
Chernault notified him of the articles contained in PGI’s June 2004 journal. Nalley
reviewed the journal and concluded that the statements contained in the journal were
defamatory and damaging to UCS’s reputation. Nalley stated that he interpreted the
article to represent that it was based on a fair, impartial, and scientifically valid
survey.  
          UCS also presented the affidavit testimony of Chernault, who stated that he is
the vice president and chief financial officer of Russell Smith, located in Houston,
Texas, he received a copy of PGI’s June 2004 journal, he regarded the statements in
the journal to be damaging to UCS’s reputation and derogatory toward UCS, and the
article caused him concern about UCS’s services. Chernault also stated that he
interpreted the article to represent that it was based on a fair, impartial, and
scientifically valid survey. 
          In September 2004, UCS filed suit against appellants for libel, libel per se,
business disparagement, tortious interference with existing contracts, and tortious
interference with prospective contractual relationships. In its petition, UCS alleged
that the article contained in PGI’s June 2004 journal was a sham, as evidenced by
PGI’s refusal to reveal the data upon which the article was based. UCS further
alleged that the sham study was motivated by the fact that UCS had recently
discredited and embarrassed Gillrie when it pursued a Daubert


 motion against him
in unrelated litigation. UCS brought suit against PGI, and against Gillrie and
Darmento individually, alleging that they drafted and edited the articles at issue. 
Appellants filed a special appearance


 and an answer, subject to their special
appearance, generally denying UCS’s allegations.
          The relevant facts are largely undisputed. UCS maintains its corporate
headquarters and principal place of business in Harris County, Texas. PGI is a
Florida corporation; it does not maintain an office in Texas, does not have a
registered agent for service of process in Texas, does not have any employees or
operations located in Texas, and does not routinely send employees to Texas or
recruit employees from Texas. However, PGI employees occasionally make and
receive telephone calls from prospective clients in Texas. PGI’s journal is “written,
compiled, and published in Florida,” and is sent to Texas through the United States
mail. PGI has approximately eighteen active subscribers and thirty non-paying
subscribers who are located in Texas and who receive the journal.


 At least two of
the Texas-based paid subscribers are current customers of UCS. 
          Darmento, the editor of the PGI journal at issue, testified that he is a resident
of Florida and that he has not been to Texas since 1990. Darmento also testified that
Gillrie is a resident of Florida, that Gillrie traveled to Galveston, Texas in June 2004
to speak at a seminar on behalf of PGI, and that Gillrie travels to Texas once a year
for similar seminars. 
 
Standard of Review
          The plaintiff bears the initial burden of pleading sufficient allegations to bring
a nonresident defendant within the provisions of the long-arm statute. BMC Software
Belgium, N.V. v. Marchand, 83 S.W.3d 789, 793 (Tex. 2002). The burden of proof
then shifts to the nonresident to negate all possible grounds for personal jurisdiction. 
Kawasaki Steel Corp. v. Middleton, 699 S.W.2d 199, 203 (Tex. 1985). The existence
of personal jurisdiction is a question of law, which must sometimes be preceded by
the resolution of underlying factual disputes. Preussag Aktiengesellschaft v.
Coleman, 16 S.W.3d 110, 113 (Tex. App.—Houston [1st Dist.] 2000, pet. dism’d
w.o.j.). When the underlying facts are undisputed or otherwise established, we
review a trial court’s denial of a special appearance de novo. Id. Where a trial court
does not issue findings of fact or conclusions of law with its special appearance
ruling, all fact findings necessary to support the judgment and supported by the
evidence are implied. BMC Software Belgium, N.V., 83 S.W.3d at 79. 
Discussion
          In their sole issue, appellants argue that the trial court erred in determining that
they are subject to the personal jurisdiction of a Texas court because (1) they have no
significant contacts with Texas; (2) they do not have continuous and systematic
contacts with Texas and cannot be subject to the general jurisdiction of a Texas court;
(3) the “fiduciary shield” doctrine protects Gillrie and Darmento from the general
jurisdiction of a Texas court; (4) they are not subject to the specific jurisdiction of a
Texas court; and (5) the exercise of jurisdiction over them would violate traditional
notions of fair play and substantial justice.              
          A court may assert personal jurisdiction over a nonresident defendant only if the
requirements of both the Fourteenth Amendment’s due process clause and the Texas
long-arm statute are satisfied. See U.S. Const. amend. XIV, § 1; Tex. Civ. Prac. &
Rem. Code Ann. § 17.042 (Vernon 1997); CSR Ltd. v. Link, 925 S.W.2d 591, 594
(Tex. 1996) (orig. proceeding). The Texas long-arm statute allows a court to exercise
personal jurisdiction over a nonresident defendant who does business in Texas. Tex.
Civ. Prac. & Rem. Code Ann. § 17.042. A nonresident “does business” in Texas if
he, among other things, “commits a tort in whole or in part” in Texas. Id.


 The Texas
Supreme Court has repeatedly interpreted this statutory language “to reach as far as
the federal constitutional requirements of due process will allow.” CSR Ltd., 925
S.W.2d at 594 (citations omitted). Therefore, the requirements of the Texas long-arm
statute are satisfied if the exercise of personal jurisdiction comports with federal due
process limitations. Id.
          The United States Constitution permits a state to assert personal jurisdiction
over a nonresident defendant only if the defendant has some minimum, purposeful
contacts with the state and if the exercise of jurisdiction will not offend traditional
notions of fair play and substantial justice. Dawson-Austin v. Austin, 968 S.W.2d 319,
326 (Tex. 1998). A nonresident who has purposefully availed himself of the
privileges and benefits of conducting business in the state has sufficient contacts with
the state to confer personal jurisdiction. CSR Ltd., 925 S.W.2d at 594. 
          The “purposeful availment” requirement has recently been characterized by the
Texas Supreme Court as the “touchstone of jurisdictional due process.” Michiana
Easy Livin’ Country, Inc. v. Holten, 168 S.W.3d 777, 784 (Tex. 2005). In Michiana,
the Texas Supreme Court articulated three important aspects of the purposeful
availment inquiry. Id. at 785. First, only the defendant’s contacts with the forum
count. Id. This ensures that a defendant is not haled into a jurisdiction solely by the
unilateral activities of a third party. Id. (citing Burger King Corp. v. Rudzewicz, 471
U.S. 462, 475, 105 S. Ct. 2174, 2183 (1985)). Second, the acts relied on must be
purposeful; a defendant may not be haled into a jurisdiction solely based on contacts
that are “random, isolated, or fortuitous.” Id. (citing Keeton v. Hustler Magazine, Inc.,
465 U.S. 770, 774, 104 S. Ct. 1473, 1478 (1984)). Third, a defendant “must seek
some benefit, advantage, or profit by ‘availing’ itself of the jurisdiction” because
“[j]urisdiction is premised on notions of implied consent—that by invoking the
benefits and protections of a forum’s laws, a nonresident consents to suit there.” Id.
(citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559,
567 (1980)).
          A defendant’s contacts with a forum can give rise to either general or specific
jurisdiction. Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,
815 S.W.2d 223, 227 (Tex. 1991). UCS concedes that this case is one of specific
jurisdiction.


 Specific jurisdiction is established if a defendant’s alleged liability arises
from or is related to an activity conducted within the forum. Id. When specific
jurisdiction is asserted, the minimum contacts analysis focuses on the relationship
between the defendant, the forum, and the litigation. Id. at 228. The exercise of
personal jurisdiction is proper when the contacts proximately result from actions of
the nonresident defendant that create a substantial connection with the forum state. 
Id. at 226. The substantial connection between the nonresident defendant and the
forum state necessary for a finding of minimum contacts must come about by action
or by conduct of the nonresident defendant purposefully directed toward the forum
state. Id. 
          Although it is not determinative, foreseeability is an important consideration in
deciding whether the nonresident has purposefully established minimum contacts with
the forum state. Id. at 227. The concept of foreseeability is implicit in the requirement
that there be a substantial connection between the nonresident defendant and Texas
arising from actions or conduct of the nonresident defendant purposefully directed
toward Texas. Id. 
Minimum Contacts
          In the instant case, PGI published an article that allegedly defamed UCS, a
corporation with its headquarters and principal place of business in Harris County,
Texas; PGI mailed this journal to subscribers across the country, including
approximately fifty subscribers located in Texas. Eighteen of the Texas subscribers
were paid subscribers, while the other thirty Texas subscribers were non-paid. At least
two of the Texas-based paid subscribers are customers of UCS, and at least one of
UCS’s current and long-time customers, located in Houston, contacted UCS after
receiving the article and expressed concern about UCS’s services. Furthermore, the
article was contained in a trade journal targeted at those involved in or related to the
automobile industry, and all of the subscribers, including those located both inside and
outside of Texas, could have been considered as potential customers or industry
contacts. 
          We find the facts in this case to be comparable to those in Calder v. Jones, 465
U.S. 783, 104 S. Ct. 1482 (1984), and Keeton, 465 U.S. 770, 104 S. Ct. 1473. In
Calder, an entertainer residing in California brought suit in California against a
nationally distributed magazine with a “large circulation,” as well as the author and
editor of an allegedly defamatory article published in that magazine. Id., 465 U.S. at
785–86, 104 S. Ct. at 1484–85. The author and editor, both residents of Florida,
objected to the jurisdiction of the California court. Id. The record established that
approximately 600,000 copies of the magazine were circulated in California, out of a
total circulation of 5 million. Id., 465 U.S. at 785, 104 S. Ct. at 1484. Finding that
“the allegedly libelous story concerned the California activities of a California
resident” and that California was “the focal point both of the story and the harm
suffered,” the Supreme Court held that jurisdiction over the editor and author in
California was proper “based on the effects of their Florida conduct in California.” 
Id., 465 U.S. at 788–89, 104 S. Ct. at 1486–87. In support of its holding, the Supreme
Court noted that the defendants wrote and edited an article that they knew would have
a potentially devastating impact upon the entertainer in California, and that the
defendants should “reasonably anticipate” being haled into court in California. Id.,
465 U.S. at 789–90, 104 S. Ct. at 1487. Similarly, in Keeton, a resident of New York
brought suit for libel in New Hampshire against a magazine with its principal place
of business in California for publishing allegedly defamatory statements. Id., 465 U.S.
at 772, 104 S. Ct. at 1477. Noting that the regular monthly sales of thousands of
magazines in New Hampshire could not be characterized as “random, isolated, or
fortuitous,” the Supreme Court held that such circulation in the forum state was
sufficient to support an assertion of jurisdiction in a libel action based on the contents
of the magazine. Id., 465 U.S. at 773–74, 104 S. Ct. at 1478. 
          Appellants argue that Calder is inapplicable because the alleged defamation
“has absolutely no connection to the State of Texas,” the journal does not specifically
mention the State of Texas, there was no evidence to show that UCS’s operations were
centered in Texas, and there was no evidence that the journal was aimed at Texas or
widely circulated in Texas. Here, however, PGI’s allegedly defamatory statements
were contained in its trade journal that it sent to approximately fifty customers located
in Texas. Moreover, the allegedly defamatory statements concerned UCS, a
corporation with its headquarters and principal place of business in Texas. 
          In regard to appellants’ attempts to distinguish Keeton, we recongize that the
circulation of the magazine in Keeton was much more substantial than the circulation
of the PGI journal. More importantly, however, the PGI journal is a trade publication
with a limited audience targeted to a specific industry, and it is neither surprising nor
determinative that the PGI journal has a more limited circulation than that of a
nationwide magazine marketed to the general populace.


 We also note that the record
is void of any evidence related to the number of subscribers to the PGI journal, the
location of these subscribers, the percentage of subscribers who reside in Texas versus
those who reside in other states, the location of the subscribers who responded to the
survey and provided the underlying data for the survey, and the exact number of
copies sent to the Texas subscribers. To the extent appellants are attempting to bolster
their jurisdictional challenge with these facts, they have failed to provide any
evidentiary support. 
          Appellants cite to several cases for the proposition that merely mailing
documents into a state is insufficient to become subject to the jurisdiction of that
state’s courts. These cases are easily distinguishable. For example, appellants cite the
Texas Supreme Court’s statement in National Industrial Sand Ass’n v. Gibson, 897
S.W.2d 769, 774 (Tex. 1995), that “[a]n organization that mails national newsletters
and notices of acceptance of dues to a member company in Texas has not purposefully
established minimum contacts such that it could reasonably foresee being sued in the
courts of this State.” However, this statement was made in the context of a general
jurisdiction analysis, and has no application to the facts supporting the exercise of
specific jurisdiction in this case. Another case cited by appellants, U-Anchor
Advertising, Inc. v. Burt, 553 S.W.2d 760, 763 (Tex. 1977), involved a contract
dispute over a contract that was “solicited, negotiated, and consummated” in
Oklahoma. In determining that the nonresident in that case had not purposefully
conducted activities within Texas, the supreme court noted that the nonresident was
merely “a passive customer of a Texas corporation who neither sought, initiated, nor
profited from his single and fortuitous contact with Texas.” Id. The holding in U-Anchor does not support appellants’ challenge to the jurisdiction of a Texas court to
hear UCS’s libel claims. 
          Appellants also cite Revell v. Lidov, 317 F.3d 467 (5th Cir. 2002), to support
their argument that there is no jurisdiction because the publication was not “directed
specifically at Texas.” Like the other cases cited by appellants, Revell is
distinguishable. In Revell, the Fifth Circuit held that an article posted on a website
bulletin board was “presumably directed at the entire world, or perhaps just concerned
U.S. citizens,” but “certainly was not directed specifically at Texas.” Id. at 475. Here,
appellants directed copies of their journal, which allegedly contained an article
defaming a corporation with its headquarters and principal place of business in Texas,
to fifty subscribers located in Texas, as well as to an unknown number of subscribers
across the country.
          In support of their special appearance, appellants also refer to Michiana, 168
S.W.3d 777. In Michiana, a Texas resident bought a recreational vehicle from a
nonresident seller, and brought suit against the seller for an alleged misrepresentation
made during a phone call initiated by the buyer. Id. at 781, 784. The seller, a separate
legal entity from the manufacturer, was located in Indiana, did not have employees or
property in Texas, was not authorized to do business in Texas, did not advertise in
Texas or on the Internet, and did not solicit business from the purchaser or from
anyone else in Texas. Id. at 784. The supreme court addressed the question of
whether suit could be brought in Texas against the seller based on its alleged
misrepresentation in this single, unsolicited telephone call. Id. The supreme court
held that “because [the seller’s] only contact with Texas was [the buyer’s] decision to
place his order from [Texas],” the seller was not subject to the jurisdiction of a Texas
court. Id. at 794. Here, unlike in Michiana, the exercise of jurisdiction over PGI, a
nonresident, is consistent with the touchstone of purposeful availment. PGI is subject
to the jurisdiction of Texas courts, not because of the unilateral activity of a third
party, but because of its purposeful contacts with Texas. Additionally, PGI’s mailing
of the journal to Texas subscribers is not “random, isolated, or fortuitous.” Finally,
by directing the trade journal to Texas subscribers, PGI was seeking a “benefit,
advantage, or profit,” and, thus, consented to being sued in Texas for allegedly
defamatory statements contained in the journal.


 
          As to the special appearances filed on behalf of Darmento and Gillrie
individually, they contend that the trial court erred in denying their special
appearances because UCS’s cause of action did not arise out of or relate to their Texas
contacts. UCS asserts, with evidentiary support, that Gillrie and Darmento drafted and
edited the articles contained in PGI’s journal. In Calder, the Supreme Court stated
          Petitioners are correct that their contacts with California are not
to be judged according to their employer’s activities there. On the other
hand, their status as employees does not somehow insulate them from
jurisdiction. Each defendant’s contacts with the forum State must be
assessed individually. In this case, petitioners are primary participants
in an alleged wrongdoing intentionally directed at a California resident,
and jurisdiction over them is proper on that basis.
 
Id., 465 U.S. at 790, 104 S. Ct. at 1487 (citations omitted). Similarly, UCS is alleging
that Gillrie and Darmento are primary participants in tortious conduct directed at it,
and UCS is seeking to hold them individually liable for their role in publishing
allegedly defamatory statements in a trade article directed by PGI to at least fifty
subscribers located in Texas about UCS, a corporation with its headquarters and
principal place of business in Texas.


 
          Here, there is a direct relationship between appellants, their purposeful contacts
with subscribers located in Texas, and UCS’s claims arising out of alleged defamatory
statements made in PGI’s journal. Accordingly, we hold that appellants have
established sufficient minimum contacts with Texas to subject them to personal
jurisdiction. 
Traditional Notions of Fair Play and Substantial Justice
          The exercise of personal jurisdiction over a nonresident defendant must also
comport with traditional notions of “fair play and substantial justice.” Guardian
Royal, 815 S.W.2d at 228. The burden is on the defendant to present a compelling
case that the presence of some other considerations renders the exercise of jurisdiction
unreasonable. Id. at 231 (quoting Burger King, 471 U.S. at 477, 105 S. Ct. at 2185). 
In making a determination, a court generally must look to the following factors: (1)
the burden on the defendant; (2) the interests of the forum state in adjudicating the
dispute; (3) the plaintiff’s interest in obtaining convenient and effective relief; (4) the
interstate judicial system’s interest in obtaining the most efficient resolution of
controversies; and (5) the shared interest of the several states in furthering substantive
social policies. Id. at 228, 231. Only in rare cases will the exercise of jurisdiction not
comport with fair play and substantial justice when a nonresident defendant has
purposefully established minimum contacts with the forum state. Id. at 231. 
Furthermore, distance from the forum is generally not sufficient to defeat jurisdiction
because the availability of “modern transportation and communication have made it
less burdensome for a party sued to defend himself in a state where he engages in
economic activity.” McGee v. Int’l Life Ins. Co., 355 U.S. 220, 223, 78 S. Ct. 199, 201
(1957).
          Here, appellants contend that “the difficulties attendant in calling [them] across
state borders to defend themselves in this lawsuit are onerous.” Appellants note that
none of the records, files, or witnesses necessary for trial are located in Texas. 
Appellants also assert that Texas has no interest in adjudicating this case and that,
because UCS has the financial resources and ability to seek relief in Florida, it should
do so. However, the fact remains that UCS employees and customers, who would
likely be called as witnesses in this case, are located in Texas and that UCS
documents, which would likely be produced in discovery, may be located in Texas. 
Furthermore, although it appears that defending this suit in Texas might necessitate
unwelcome travel and expense for appellants, these factors alone are not
determinative. See Guardian Royal, 815 S.W.2d at 231. Certainly, prosecution of this
suit in Florida would involve similar inconveniences for UCS. However, “there is no
legal requirement that this hardship must be borne instead by the plaintiff whenever
the defendant is not found in the state of the plaintiff’s residence.” Wright v. Sage
Eng’g, Inc., 137 S.W.3d 238, 253–54 (Tex. App.—Houston [1st Dist.] 2004, pet.
denied). Finally, contrary to appellants’ assertion, Texas does have an interest in
providing its citizens with a forum to adjudicate claims against citizens of other states
who committed tortious acts against its residents. See Guardian Royal, 815 S.W.2d
at 232 (recognizing that interests of forum state and plaintiff frequently will justify
severe burden placed upon nonresident defendant). Thus, we hold that the exercise
of personal jurisdiction over appellants in this case comports with traditional notions
of fair play and substantial justice. 
          Accordingly, because the record indicates that appellants’ contacts with Texas
are sufficient to create specific jurisdiction over them and because the exercise of
personal jurisdiction over appellants comports with traditional notions of fair play and
substantial justice, we further hold that the trial court did not err in denying appellants’
special appearance.
          We overrule appellants’ sole issue.
Conclusion
          We affirm the order of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice
 
Panel consists of Justices Nuchia, Jennings, and Higley.